J-A01040-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | No. 2133 EDA 2023 |

Appeal from the Order Entered July 19, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000305-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: S.N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | No. 2135 EDA 2023 |

Appeal from the Order Entered July 19, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000306-2022

BEFORE:   LAZARUS, P.J., PANELLA, P.J.E, and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED FEBRUARY 9, 2024**

The Department of Human Services of the City of Philadelphia ("DHS") appeals from the orders denying its petitions to terminate the parental rights of B.B. ("Mother") to her twin sons, P.A.B. and S.N.B. (collectively, "Children").  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Children first came to the attention of DHS on the date of their birth in August 2020 when DHS received a general protective services report alleging that Children had tested positive for PCP at the hospital. DHS obtained an order of protective custody for Children within days of their birth, and they were placed in the care of Mother's godmother ("Godmother"). On October 7, 2020, Children were adjudicated as dependent. Children have remained in Godmother's care throughout these proceedings. Permanency review hearings occurred on January 27, May 27, and October 13, 2021, and March 2, 2022.

DHS filed petitions to terminate the parental rights of Mother and unknown father on May 10, 2022. The grounds for termination for Mother were Section 2511(a)(1), (2), (5), and (8) of the Adoption Act. After continuances on July 20, October 14, and December 14, 2022, and March 1 and April 19, 2023, an evidentiary hearing occurred on July 19, 2023. At the hearing, Patricia Garvey, case manager for the Community Umbrella Agency ("CUA") testified for DHS. Mother also testified at the hearing, and she presented the testimony of Aisha Bryant, Mother's case manager at Northeast Treatment Center ("NET").

At the hearing, Garvey testified that after Children came into DHS's care, a case plan was prepared for Mother that required her to take parenting classes, have mental health evaluation, obtain adequate housing, provide CUA with a lease for her housing and allow CUA to examine the suitability of her home, provide CUA with employment information, and sign all of the releases

requested by CUA. N.T., 7/19/23, at 10-11, 21. Garvey testified that Mother was not initially required to complete drug and alcohol services but was later referred for those services after she tested positive for marijuana on August 20, 2021. *Id.* at 10-13, 28-29; DHS Exhibit 1. Mother also tested positive for marijuana during an April 19, 2023 drug screen. N.T., 7/19/23, at 13; DHS Exhibit 1.

CUA requested that Mother complete random drug screens on eighteen occasions over the course of her case, and Mother did not attend any of the drug screens. N.T., 7/19/23, at 14. According to Garvey, Mother at first indicated that she did not have public transit fare to get to the testing location, but after being supplied with transit passes Mother still did not attend or provide an explanation for why she could not attend. *Id.* at 14-15. Garvey testified that Mother was referred to NET for drug and alcohol services in 2021 and 2022; she was discharged on August 20, 2021 for failing to complete the program and she did not attend any sessions in 2022. *Id.* at 15-16.

Garvey testified that Mother provided CUA with information that she had begun treatment at NET for drug and alcohol abuse on March 17, 2023, although Garvey was not aware whether Mother had completed the program. *Id.* at 16. Garvey testified that Mother was also enrolled in mental health treatment at NET in March 2023. *Id.* at 17. On cross-examination, Garvey stated that Mother completed a drug and alcohol assessment on October 7, 2020, which indicated that drug and alcohol treatment was not needed at that time; similarly, Garvey admitted that Mother's October 13, 2021 mental

health evaluation showed that she was not then required to undergo mental health treatment. *Id.* at 28-29.

Garvey testified that she never received documentation to show that Mother had obtained a job despite asking for proof of employment throughout the life of the case. *Id.* at 17-18. Garvey stated that Mother was referred to ARC for parenting, housing, education, and job placement services, and Mother had completed those services by 2021. *Id.* at 17, 32. Garvey stated that Mother refused to sign any of the consents requested by DHS, on the basis that her signature could be used to take Children away from her. *Id.* at 19.

Garvey testified that Mother had until recently been residing in the same residence that DHS had determined was inadequate at the beginning of the case. *Id.* at 18-19. According to Garvey, Mother's referral to the Fresh Start Program, a three-step transitional housing program for individuals with substance abuse issues, had been refused, but Mother was placed in Fresh Start transitional housing just prior to the hearing. *Id.* at 18, 36-37. Nevertheless, Garvey stated that Mother was not compliant with her housing objective. *Id.* at 25.

Garvey testified that Mother's visitation remained bi-weekly as of the date of the hearing because Mother did not attend any visits during 2021 and her visitation in 2022 was inconsistent. *Id.* at 19-20, 24-26. However, Garvey admitted on cross-examination that Mother's attendance at visits had been consistent since the previous court hearing on April 19, 2023, she missed

only visit from the time of the next most recent hearing on March 1, 2023, and prior to that she had "missed visits here and there." *Id.* at 39-40. When the visits were initially in Godmother's home, various visits were cancelled or virtual due to Mother's diagnosis with COVID-19 and Godmother's husband's recovery from surgery requiring Godmother and Children to reside temporarily out of Pennsylvania. *Id.* at 34-35, 37. In addition, at a certain point Mother had a falling out with Godmother and requested that the visits be supervised at CUA's offices; the visits remained supervised as of the date of the hearing. *Id.* at 24-25, 34. Garvey had supervised all but one of the visits at CUA's offices; she stated that Mother brings food and toys for Children but that Children are "all over the place," "they're not engaging" with Mother, and they "go off and play by themselves." *Id.* at 20-21. Garvey stated that Children "first they used to call [Mother] girl[,] then they started calling her homie," adding that Children "call everybody mom and homie." *Id.* at 21.

Garvey stated that Mother has "a relationship" with Children but not a parent-child relationship or as strong of a bond as Godmother has with Children. *Id.* at 21-22. Garvey testified that Children clearly know who Mother is, but whereas Godmother soothes Children and Children cry when Godmother puts them down, Children "cry and [] spaz out" when Mother picks them up and they do not cry when the visits with her finish. *Id.* at 21-24.

Garvey stated that Children are thriving and happy in Godmother's home, she attends all their medical and dental appointments, and they are safe in her home. *Id.* at 23-24, 27. On the other hand, Garvey was only

aware of one medical appointment that Mother had attended. *Id.* at 25-26. Garvey conceded that Mother did provide Children with food, toys, and clothing and did celebrate their birthdays with them. *Id.* at 28.

Garvey opined that it would be in best interests for Mother's parental rights to be terminated to allow Children to be adopted by Godmother, with whom they have had a bond since birth and to whom they look for all their needs. *Id.* at 23-24. Garvey testified that she did not believe that Children will suffer irreparable harm if Mother's parental rights were terminated. *Id.*

Mother testified that she is currently residing at Bridge House, a transitional home that provides her assistance in finding permanent housing, employment, and educational services. *Id.* at 42. Since March 2023, Mother has been participating in intensive outpatient substance abuse treatment at NET at least three times a week, with weekly drug testing. *Id.* at 42-45, 53. Mother has also elected to participate in mental health therapy through that facility and she was recently diagnosed with depression, anxiety, and PTSD. *Id.* at 43, 51. Mother stated that NET intended that she complete treatment two days prior to the hearing, but the center had elected for her to continue treatment based upon conversations with CUA. *Id.* at 44, 47, 49.

Mother admitted that she was active in her addiction from 2020 until some point in 2022. *Id.* at 48-49. Mother stated that she previously missed numerous drug screens requested by CUA because she was not prepared to confront her issues, whereas now she is able to do so. *Id.* at 44. Mother stated that, while she was using drugs, she "did not voluntarily give [her]

urine." *Id.* at 52. With respect to Mother's positive test for marijuana on April 19, 2023, she stated that she has a medical marijuana card, which she had provided to CUA. *Id.* at 45.

Mother testified that she is not currently employed as she was informed during her time in the Fresh Start program that she should not focus on employment until she had handled her substance abuse and mental health issues. *Id.* at 43. Mother hoped to obtain employment within a month of the hearing. *Id.* at 51. She had previously been employed at various jobs, including as a canvasser. *Id.* at 43-44.

Mother testified that visits with Children "go very well"; Mother brings coloring books, puzzles, and flashcards, and Children and Mother laugh and play together. *Id.* at 45. Mother stated that, contrary to Garvey's testimony, Children call her "mommy." *Id.* Mother testified that she has not missed any visits since the April 19, 2023 court date. *Id.* at 46. Mother felt "very uncomfortable" when the visits took place at Godmother's home and "[t]here were issues," including the fact that Children were not called by their birth names in that home. *Id.* at 45-46.

When asked about Garvey's testimony that Mother only attended one medical appointment for Children, Mother responded that she was only informed of one of the appointments and she did go to that appointment. *Id.* at 46-47. Mother stated that she had asked CUA for documentation on Children's appointments for two years without receiving a response until the month prior to the hearing; Godmother also did not provide Mother with

information that would have allowed her to attend Children's appointments. *Id.* at 47. Mother testified that she is currently able to perform her duties as caregiver to Children but that she is not able to take Children at present because she does not currently have suitable housing. *Id.* at 54.

Aisha Bryant, Mother's case manager at NET, testified that Mother has been in intensive drug and alcohol outpatient treatment at the facility since March 2023, which includes three group sessions per week as well as one-one-one sessions. *Id.* at 57-58. Mother has been regular with her attendance at the programs and receptive to the instructions she has received. *Id.* at 58-59. Mother also had recently participated in a psychological evaluation at NET and will continue with mental health services there. *Id.* at 59. Bryant testified that Mother's most important improvement was in her outlook and her ability to effectively communicate her feelings; Mother was "broken" when she arrived at NET and blamed others for her misfortunes, whereas now she holds herself accountable and acknowledges her role in improving her life. *Id.* at 58-60, 65.

Bryant testified that, when Mother was residing at the Fresh Start recovery home, no issues were reported and she never missed a curfew. *Id.* at 60-61. According to Bryant, Mother's current residence at Bridge House is not suitable for Children but the facility is attempting to place Mother in a location that would allow for reunification. *Id.* at 60. Bryant testified that Mother has been providing monthly drug screens at NET and Mother's results are consistent with her maintenance of sobriety. *Id.* at 61. Bryant stated

that she did not believe that termination of Mother's parental rights was appropriate. *Id.* at 63. Bryant testified that potential reunification between Mother and Children would be possible within three to six months of the hearing depending on Mother's progress. *Id.* at 63-64.

On July 19, 2023, after the hearings, the trial court entered orders denying the petitions to terminate Mother's parental rights.[1] DHS filed timely notices of appeal and concise statements of errors complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i). On September 21, 2023, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a), addressing DHS's appellate claims.

DHS presents the following issues on appeal:

1. Whether the trial court erroneously denied the petitions for the involuntary termination of Mother's parental rights where the uncontroverted evidence established that Mother did not initiate efforts to address the conditions that led to the children's placement until ten (10) months **after** the petitions were filed and thirty-one (31) months after the children entered care?

2. Whether the trial court impermissibly considered efforts by Mother that were initiated after the filing of the petition in violation of Section 2511(b)?

3. Whether the trial court erroneously failed to consider the strong and beneficial bond that the children have with their pre-adoptive foster mother, who is the only caregiver they have ever known?

DHS Brief at 4 (suggested answers omitted; emphasis in original).

_____

[1] The trial court entered decrees terminating unnamed Father's parental rights on that same date.

- 9 -

We conduct our review in light of the following:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

The burden is on the petitioner in the lower court to prove by clear and convincing evidence that the asserted grounds for seeking termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Under Section 2511 of the Adoption Act, the trial court must first determine whether the particular conduct of a parent warrants involuntary termination of their parental rights under any one of the the eleven grounds enumerated in subsection (a). 23 Pa.C.S. § 2511(a)(1)-(11); *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *T.S.M.*, 71 A.3d at 267. If the trial court determines the petitioner established grounds for termination under any

- 10 -

one of the Section 2511(a) grounds by clear and convincing evidence, the court then must proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare. 23 Pa.C.S. § 2511(b); *C.M.*, 255 A.3d at 359; *In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b). *C.M.K.*, 203 A.3d at 261-262 (citation omitted).

Here, DHS sought to terminate Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (8), and subsection (b). The statute provides

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> >
> > \*      \*      \*
> >
> > (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist,

the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*      \*      \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*      \*      \*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b).

DHS's first appellate issue concerns whether the trial court abused its discretion by finding that the agency did not meet its burden of proof to show that Mother's parental rights to Children should be terminated under Section 2511(a)(1), (2), (5), and (8) of the Adoption Act. DHS presents two overarching arguments with respect to Section 2511(a). It first contends that the trial court did not engage in the required bifurcated analysis under Section

2511 of the Adoption Act, which requires the consideration of whether termination was proper under each of the raised grounds for termination under subsection (a) before proceeding to an analysis under subsection (b). *C.M.*, 255 A.3d at 359; *C.M.K.*, 203 A.3d at 261-262. We disagree. At the conclusion of the hearing, the trial court orally announced its findings as to the specific element that DHS failed to satisfy as to each of the raised subsection (a) grounds. N.T., 7/19/23, at 82. In its Pa.R.A.P. 1925(a) opinion, the trial court then expanded on its Section 2511(a) analysis by making findings as to credibility and weight of the evidence and engaging in a detailed discussion of the facts presented. Trial Court Opinion, 9/21/23, at 7-11. The trial court then engaged in a separate Section 2511(b) analysis, concluding that termination of Mother's parental rights would not best serve Children's needs and welfare. *Id.* at 11. In this respect, we find the trial court's Section 2511 analysis adequate.

DHS also argues that the trial court erred by considering Mother's efforts to alleviate the conditions that led to Children's removal that were initiated after DHS filed its petition. We agree with DHS in part. Section 2511(b) provides that: "With respect to any petition filed pursuant to subsection **(a)(1)**, (6) or **(8)**, the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b) (emphasis added); *see also In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "The court, however, may consider post-petition efforts if the efforts

were initiated before the filing of the termination petition and continued after the petition date.". **Z.P.**, 994 A.2d at 1121. Here, the trial court did not distinguish between Mother's efforts before or after May 10, 2022, the date of filing of the termination petitions as to Children and the provision of notice of same, in its analysis under subsections (a)(1) and (8).

However, with respect to DHS's argument that the limitation on consideration of post-petition conduct also applies to subsections (a)(2) and (5), which are not included in the aforementioned proviso of subsection (b), we reject this contention. Section 2511(b) clearly limits its effect to certain grounds for termination under Section 2511(a), and there is nothing in the text of the statute indicating that a petitioner's decision to proceed under subsection (a)(1), (6) or (8)—the grounds for termination mentioned in subsection (b)—requires that the trial court not consider conduct first initiated after the petitions' filing as relevant to any other subsection (a) ground for termination included in that same petition. Accordingly, to the extent the trial court considered Mother's conduct initiated after May 10, 2022 in its analysis under subsections (a)(1) and (8), we will disregard that evidence and focus on whether there was sufficient additional support for the trial court's determination that DHS did not meet its burden of proof on those grounds. However, we do not likewise limit our review as to the trial court's analysis under subsections (a)(2) and (5).

To terminate parental rights under Section 2511(a)(1), the petitioner "must demonstrate by competent, clear and convincing evidence [that] [t]he

parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." *In re Adoption of C.M.*, 255 A.3d 343, 363-64 (Pa. 2021) (citation and quotation marks omitted). While parental duties are not defined in the Adoption Act,

> our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions and develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021) (internal quotation marks, brackets and internal citations omitted).

A court addressing a petition filed under Section 2511(a)(1) shall "examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citation and brackets omitted). "Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." *Id.*

- 15 -

While courts must not engage in a mechanical application of the terms of the Adoption Act, the "most critical period for evaluation [under Section 2511(a)(1)] is six months immediately preceding the filing of the termination petition." *Id.* at 592.

Here, the trial court found that DHS had not proved that Mother had evinced a settled purpose of relinquishing a parental claim to Children or had refused or failed to perform her parental duties. N.T., 7/19/23, at 82. The trial court began its analysis by focusing on the deficiencies in DHS's case, noting that the DHS only presented one witness, Mother's CUA case manager, Garvey, without testimony from an expert, Children's current caregiver, or any other person. Trial Court Opinion, 9/21/23, at 7. The court found that Garvey spoke of Mother's lack of progress "in an overly broad and conclusory manner" on direct, "describ[ing] Mother as largely uncooperative, apathetic, and non-compliant," while only on cross-examination did "a more complete, detailed, and positive" picture of Mother come into view. *Id.* at 7-8. The court noted that Mother had made progress towards the goals established by DHS, including on housing and visitation. *Id.* at 8. The court recounted Mother's description of her "beautiful" visits with Children where they laugh, play, and do puzzles and flashcards together, and Children call Mother "mommy"; the court specifically found that Mother's description of her relationship with Children was more credible than Garvey's and accorded Mother's account greater weight. *Id.* at 10-11.

The trial court further discussed Mother's "strained relationship with" Children's current caregiver, Godmother, who has requested that Children call Godmother and her husband "mom" and "dad" and does not use Children's birth names. *Id.* at 10. The court also described the "concerning" situation regarding Mother not having been advised of Children's medical appointments; the court found that Mother credibly testified that she had asked to be involved in Children's care but was stymied by Godmother and CUA from doing so. *Id.* at 10. The court found that Mother explained the reasons for "her missing drug screens in an accountable[] and honest manner," which the court found reflected positively on "Mother's honesty" and was "an important sign of personal growth and positive development." *Id.* at 11.

DHS argues that, contrary to the trial court's findings, the evidence presented at the termination hearing demonstrated that Mother had a settled purpose of relinquishing her parental claim to Children during the six-month period prior to May 10, 2022. DHS notes that Mother did not attend drug and alcohol services in 2021 and 2022, she failed to visit Children during 2021 and in 2022 her attendance at visits was inconsistent, she was admittedly in active addiction during 2020 and 2021 and only became sober in 2022, and she had not obtained employment or adequate housing for Children at any point during the case. DHS contends that, disregarding "Mother's eleventh-hour attempt to address her substance abuse issues" in March 2023, as the court was required to do by Section 2511(b), DHS Brief at 24, Mother demonstrated no

intent or effort to provide Children with parental care during the six months leading up to May 10, 2022.

Upon review, we conclude that the trial court did not abuse its discretion in finding that DHS did not prove by clear and convincing evidence that Mother's parental rights should be terminated under Section 2511(a)(1). First, we emphasize that the trial court found Garvey's sweepingly negative characterization on direct of Mother's compliance with CUA's goals to be a mischaracterization of the case history and belied by the more nuanced account on cross-examination; the court also found Mother's testimony to be credible and genuine and specifically credited Mother's testimony regarding her relationship with Children over Garvey's account of the relationship. Trial Court Opinion, 9/21/23, at 7-8, 10-11. We find that the court's credibility and weight-of-the-evidence findings are supported by the record, and, as such, they are binding on this Court. *J.R.R.*, 229 A.3d at 11.

We also note that the record at the hearing reveals a general lack of clarity as to the timeline of events and specifically whether certain key events fell within the six-month period prior to the filing of the termination petitions on May 10, 2022.[2] For example, the testimony revealed that Mother

---

[2] Rather than presenting testimony regarding the history of the case at the termination hearing, DHS relied in large part on a "Statement of Facts" attached to each termination petition to describe the history of the case, which the trial court adopted in part in its opinion. Termination Petitions, 5/10/22, Exhibit A; Trial Court Opinion, 9/21/23, at 2-4. However, allegations in pleadings are not facts, and absent a stipulation or admission by Mother that
*(Footnote Continued Next Page)*

completed services offered through ARC in parenting, housing, education, and job placement services in 2021 without indication of whether she completed these classes in the final two months of that year and therefore would fall within the critical period under Section 2511(a)(1). N.T., 7/19/23, at 17, 32. Additionally, Mother testified that she achieved sobriety during 2022, but her testimony did not indicate whether that occurred before or after May 10, 2022. *Id.* at 48-49. In light of the fact that the petitioner bears the burden of proof to present clear and convincing evidence supporting termination, **L.W.**, 267 A.3d at 522, the ambiguities regarding the dates of the evidence should be resolved against DHS and therefore it is appropriate to consider this evidence in the Section 2511(a)(1) analysis, notwithstanding Section 2511(b)'s restriction with respect to post-petition evidence.

With these considerations in mind, we find ample support in the record for court's conclusion that Mother did not have a settled purpose of relinquishing her parental claim to Children and she did not refuse to perform her parental duties. At the time that the termination petition was filed, Mother had completed the parenting, housing, education, and job placement services that were offered to her by the agency, and she had attained sobriety. While Mother was inconsistent in visitation during this period, as the court noted and Garvey testified, this was in part attributable to friction with Godmother,

---

the case history contained within the "Statement of Facts" is accurate, neither the lower court nor this Court can rely on DHS's summary of the case history.

Mother's COVID-19 illness, and Godmother's husband's recovery from surgery which required the family to reside out of state for a time. Moreover, Mother maintained a positive relationship with Children, their visits were full of play and educational activities, and Children referred to her as their mother. Mother also attempted to attend Children's medical appointments and otherwise involve herself in their lives, but she was prevented from doing so by CUA and Godmother. In sum, the record shows that, although Mother was not fully compliant with the agency's reunification goals as of the date that the termination petition was filed, she was actively attempting to provide Children with the necessary love, protection, guidance, and support and maintain a place of importance in their lives such that she did not have a settled purpose or refuse to be Children's parent. *L.A.K.*, 265 A.3d at 592.

Turning to the asserted grounds for termination under Section 2511(a)(2), this provision requires proof "by clear and convincing evidence that there is (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *Id.* at 600.

> [S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint

- 20 -

in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

***Z.P.***, 994 A.2d at 1117 (citation and emphasis omitted).

The trial court found that DHS did not meet its burden under Section 2511(a)(2) because Mother had demonstrated through her actions that she would remedy the causes of her incapacity to provide Children with essential parental care, as shown by the testimony of Mother and Bryant, her case manager at NET, regarding her intensive outpatient treatment at that facility commencing in March 2023. Trial Court Opinion, 9/21/23, at 8-9. The trial court cited Bryant's testimony that Mother had made "notable improvement" since starting drug and alcohol and mental health treatment at NET four months prior to the hearing, including by holding herself accountable for her failings and acknowledging her faults, working on the issues that led to her need for treatment, becoming a better communicator, and adopting a more realistic outlook. ***Id.*** The court also discussed Mother's "credible and genuine" testimony regarding her treatment at NET, as well as her progress in obtaining suitable housing, including her residence at Fresh Start for three months, her current placement in the Bridge House, and her anticipated transition towards permanent housing. ***Id.*** at 9-10. The court further noted that Mother had a perfect attendance record at visitation sessions in the months prior to the hearing. ***Id.*** at 8.

DHS argues that the evidence presented showed that Mother could not remedy her repeated and continued incapacity to provide Children with proper

and necessary parenting, which specifically arose out of Mother's longstanding, untreated substance abuse issues. DHS contends that the trial court could not consider Mother's efforts to address her addiction after the termination petition was filed, **but see supra**; even assuming the post-petition evidence could be considered, however, the agency asserts that the trial court abused its discretion in finding in favor of Mother on subsection (a)(2) because there was no "rational prospect of timely reunification" for Mother and Children. **Z.P.**, 994 A.2d at 1126. DHS maintains that, notwithstanding Mother's intensive outpatient treatment at NET, there was no definite testimony as to when Mother would be discharged from the program or when reunification was possible with Children.

The trial court did not abuse its discretion in finding that DHS did not meet its burden under Section 2511(a)(2). Mother made substantial progress towards remedying the issues that led to Children's removal as of the date of the termination hearing by achieving sobriety,[3] she had completed the services offered to her by the agency, and she was attending all of her supervised visits with Children. In addition, as illustrated by the testimony of Bryant, her case manager at NET, Mother had successfully engaged in

_____

[3] While Mother tested positive for marijuana on a CUA drug screen on April 19, 2023, she testified that she had received a medical marijuana card by that date and DHS did not present evidence to rebut this contention. N.T., 7/19/23, at 45, 61. Furthermore, while DHS asserts that Mother also tested positive for trace amounts of cocaine on that same drug screen, **Id.** at 12; DHS Brief at 7, the test report submitted by the agency showed that the screen was negative for cocaine. DHS Exhibit 1.

outpatient drug and alcohol and mental health treatment at that facility since March 2023, which had resulted in improvements to her communication style, her outlook, and her ability to address her addiction. While DHS contends that there was no realistic prospect for reunification at the time of the hearing, the testimony of Mother and Bryant revealed that reunification was possible in as little as three months[4] and depended in large part on Mother's placement in suitable housing, which NET and CUA were working on as of the date of the hearing. As these findings are supported by the record, we conclude that the trial court properly found that the causes of Mother's incapacity to provide Children with essential care were being remedied at the time of the termination hearing. 23 Pa.C.S. § 2511(a)(2); **L.A.K.**, 265 A.3d at 600.

DHS combines its argument and only briefly addresses the remaining two Section 2511(a) grounds for termination that it raised in the termination petition, subsections (a)(5) and (a)(8). DHS argues that all elements were met with respect to these two subsections: Children were in care for 34 months at the time of the termination hearing, far exceeding the six-month and twelve-month periods set forth in the two subsections; the conditions leading to Children's removal—Mother's substance abuse issues—continued to

---

[4] DHS argues that Bryant testified that reunification would not be possible until at least seven months after the hearing. DHS Brief at 7. However, this misconstrues Bryant's testimony; she testified that Mother could be eligible for reunification within seven months of Mother's commencement of treatment in March 2023, which would be three months after the date of the hearing on July 19, 2023. N.T., 7/19/23, at 63-64.

exist; and termination would best serve Children's needs and welfare. We disagree.

To demonstrate that a parent's parental rights should be terminated under Section 2511(a)(5), the petitioner must prove by clear and convincing evidence that "(1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re C.B.*, 230 A.3d 341, 348 (Pa. Super. 2020) (quoting *Z.P.*, 994 A.2d at 1118). In addressing whether the conditions which led to removal and placement of the child continue to exist, courts should consider whether the parent cannot or will not remedy the conditions within a reasonable period of time and whether the services reasonably available to the parent are unlikely to remedy the conditions within a reasonable period of time. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1273 (Pa. Super. 2003).

Here, the trial court concluded that DHS had not shown that Mother would not remedy the conditions that led to Children's removal within a reasonable period of time, citing Bryant's testimony that Mother may be in a position that would allow for reunification within three to six months of the hearing. N.T., 7/19/23, at 82. We discern no basis to disturb the trial court's ruling. As described above, at the time of the termination hearing Mother was no longer abusing the drugs that had led to Children's removal, she was receiving intensive outpatient substance abuse and mental health treatment,

she was residing in transitional housing, and she regularly participated in appropriate, beneficial visitation with Children. Furthermore, Bryant estimated that Mother could potentially reunite with Children in as few as three months depending on her successful completion of treatment at NET and her placement in permanent housing suitable for Children. The court's finding that a three-to-six-month period constituted "a reasonable period of time" for Mother to fully remedy the conditions that led to Children's placement is not an abuse of discretion. 23 Pa.C.S. § 2511(a)(5); **M.E.P.**, 825 A.2d at 1273.

Finally, with respect to Section 2511(a)(8), the petitioner bears the burden of showing: "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." **Interest of M.E.**, 283 A.3d 820, 832 (Pa. Super. 2022) (citation omitted). Here, the trial court found that DHS had not met its burden as to the second element, and we likewise focus on this requirement. N.T., 7/19/23, at 82. Unlike other Section 2511(a) subsections, subsection (a)(8) "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement" of the child. **M.E.**, 283 A.3d at 832. While the lower court may not consider post-petition efforts undertaken by the parent in its analysis under Section 2511(a)(8), **see** 23 Pa.C.S. § 2511(b), our courts have stated that the relevant inquiry under the second element of subsection (a)(8) "is whether the conditions that led to removal have been remedied and thus

- 25 -

whether reunification of parent and child is imminent at the time of the hearing." **M.E.**, 283 A.3d at 832; **see also In re C.B.**, 230 A.3d 341, 348-49 (Pa. Super. 2020).

The lower court did not abuse its discretion in finding that DHS did not prove that the conditions that led to Children's removal continued to exist. As of the date that the termination petitions were filed, Mother had achieved sobriety—the primary condition that led to Children's removal. In addition, Mother had completed the parenting, housing, education, and job placement services offered by CUA, she was engaged in visitation with Children and had a positive relationship with them, and she was attempting to attend Children's medical appointments and otherwise be more involved in their lives, but she was stymied by their caregiver and CUA. Moreover, as of the date of the hearing, the evidence showed that Mother's reunification with Children could happen in as little as three months. The lower court was within its authority to find that reunification with Children was "imminent[]." **M.E.**, 283 A.3d at 832; **C.B.**, 230 A.3d at 348-49. Therefore, the court properly found that DHS did not meet its burden as to subsection (a)(8).

Accordingly, we conclude that DHS did not meet its burden as to any of the asserted grounds for termination under Section 2511(a) of the Adoption Act. Because a petitioner is required to prove a subsection (a) ground for termination before the court addresses whether termination serves the child's needs and welfare under Section 2511(b), **see C.M.**, 255 A.3d at 359; **C.M.K.**, 203 A.3d at 261-262, we need not address DHS's second and third issues

relating to subsection (b). We therefore affirm the lower court's order denying the petition to terminate Mother's parental rights to Children.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/9/2024