J-A29038-21

2021 PA Super 247

| | | |
|---|---|---|
| IN THE INTEREST OF:  L.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 770 WDA 2021 |

Appeal from the Order Entered June 4, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000099-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: L.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 772 WDA 2021 |

Appeal from the Order Entered June 4, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000100-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: S.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 774 WDA 2021 |

Appeal from the Order Entered June 4, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000095-2020

J-A29038-21

BEFORE: BENDER, P.J.E., DUBOW, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                    **FILED: DECEMBER 15, 2021**

W.H. (Mother) appeals from the orders[1] issued in the Court of Common Pleas of Allegheny County (orphans' court) involuntarily terminating her parental rights to Lry.W. (d.o.b. September 2011) (Child 1), Lar.W. (d.o.b. August 2013) (Child 2) and S.H.(d.o.b. May 2019) (Child 3) (collectively, the Children) and changing their permanency goal to adoption. She challenges the court's finding that termination would best serve the needs and welfare of the Children pursuant to 23 Pa.C.S. § 2511(b).[2] After our careful review, we affirm.

We take the following factual background and procedural history from our independent review of the certified record and the trial court's August 11, 2021 opinion.

**I.**

Allegheny County Office of Children, Youth & Families (CYF) became involved with the family in 2012 and continued to receive General Protective

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court entered three separate orders from which Mother appealed. This Court consolidated the appeals *sua sponte* on July 27, 2021.

[2] Father has appealed the June 4, 2021 termination of his parental rights to Lry.W. (d.o.b. 9/11) at docket number 771 WDA 2021. He is not the subject of this appeal. The orphans' court June 4, 2021 order also terminated the parental rights of S.H.'s father. He has not appealed.

- 2 -

Services (GPS) referrals raising multiple child welfare issues. On March 5, 2018, CYS received a referral that Mother injured Child One when she physically disciplined her. On March 14, 2018, maternal grandmother filed a private dependency petition for Child 1 and Child 2 (collectively, the Girls).

On April 19, 2018, Mother was incarcerated for violating her probation. CYF filed a dependency petition regarding the Girls on April 23, 2018. On April 25, 2018, the court placed the Girls in kinship care with maternal grandmother. On May 23, 2018, the Girls were adjudicated dependent. Mother stipulated to the facts supporting the adjudication and placement with maternal grandmother, where they continue to remain. The court ordered supervised visitation and ordered Mother to engage in an appropriate level of drug and alcohol treatment; to establish and maintain sobriety; to develop and use alternatives to physical discipline; to address all criminal matters; to participate in coached visitation; and comply with random drug screens.

Mother gave birth to Child 3 in May 2019. At his birth, both Mother and Child 3 tested positive for THC. CYF took custody of Child 3 on May 30, 2019, because of ongoing concerns about Mother's dual diagnosis issues, the fact that she tested positive for marijuana throughout the pregnancy, both she and Child 3 tested positive for THC at his birth, and concerns that Mother had not remedied the conditions that required the Girls to remain in placement. Child 3 was initially placed with a maternal cousin and soon thereafter was placed with maternal grandmother, where he has remained since June 2019.

The orphans' court adjudicated Child 3 dependent on July 3, 2019. Mother was ordered to attend random drug screens; supervised visits with Children and forensic psychological evaluations; verify treatment; participate in coached parenting; obtain stable housing; maintain contact with CYF; and resolve criminal court issues.

On July 2, 2020, CYF filed a termination petition regarding all three Children. The orphans' court held a termination hearing on April 8, 2021, and May 21, 2021. In pertinent part, CYF presented the testimony of CYF Caseworker Lisa Ketter, court appointed expert evaluator Dr. Patricia Pepe, Holy Family in-home service provider Eric Yowonske, coached visitation specialist Doug Conroy, Allegheny County lab technician Daniel Zoldos, transportation coordinator William Pipkins and maternal grandmother. Mother testified on her own behalf.

Testimony established that Mother failed to meet her court-ordered goals. At the time of the hearing, Mother was involved with a drug and alcohol program, but was not attending regularly. She attended only 7 out of 66 drug screens and tested positive each time. Mother reported involvement with dual diagnosis programs but failed to provide CYS with any documentation to confirm her consistent attendance, progress or completion of either drug and alcohol or mental health treatment. CYF referred Mother to both Holy Family and Justice Works for coached visitation, a service provided to work on her

parenting skills, but she was discharged from both services for non-compliance.

Originally, Mother was having supervised visits at maternal grandmother's home. However, on July 11, 2018, they moved to CYF. Maternal grandmother testified about a history of frequent incidents of conflict with Mother in front of the Children that included name calling and Mother "[being] highed up, very disrespectful" and irrational. She described Mother as argumentative and dysfunctional. For example, the Children witnessed Mother passed out in the home requiring paramedic intervention because she was non-responsive. She had also taken the Children from the home without authorization, had come to family events intoxicated and disruptive and, in May 2021, had threatened to kill maternal grandmother. These incidents scared and upset the Children.

Mother attended no visits between July 2018 and January 11, 2019. Mr. Pipkins, the transportation supervisor with A Second Chance, Inc. (ASCI) stated that between January 2019 and June 2019, ASCI scheduled 29 visits and Mother attended 7 of them. On July 3, 2019, Mother was permitted two supervised visits per week with the Girls and three with Child 3 at maternal grandmother's home. However, on August 15, 2019, the court again ordered that biological parents were no longer permitted to be on the premises at maternal grandmother's residence. Between June 2019 and April 10, 2020, Mother attended only 4 of the 22 scheduled visits.

As of the date of the hearing, there was no longer a set visitation schedule. Maternal grandmother testified that Mother has phone or video calls with the Children approximately two times per week and only sees them on holidays or special occasions. The orphans' court found this testimony credible and found Mother's claim that she speaks with the Children daily incredible.

Ms. Ketter observed positive bonded interactions between maternal grandmother and the Children and testified that they are loving and affectionate with each other. The Children are doing very well in maternal grandmother's care and seek her out for comfort. Ms. Ketter testified that maternal grandmother is very supportive and attentive to the Children, ensuring that their educational, developmental and therapeutic needs are met.

Dr. Pepe's observations and testimony were consistent with Ms. Ketter's. She did not reach conclusions regarding Children's relationship with Mother because she was unable to evaluate her due to Mother's failure to attend any scheduled evaluations, in violation of the court's orders that she do so.[3] However, Dr. Pepe conducted two interactional evaluations with the

_____

[3] We note that Mother comments that while Dr. Pepe recommended adoption for all three of the Children, "she was unable to reach conclusions or make recommendations regarding the Children's relationship with [Mother], as she was unable to evaluate [her]." (Mother's Brief, at 12) (citing N.T. Hearing, 4/08/21, at 56, 64). However, as stated above, Dr. Pepe did not evaluate Mother because Mother failed to attend her scheduled interactional evaluation in violation of the court's order. She cannot now use her own intentional
*(Footnote Continued Next Page)*

Girls and maternal grandmother and observed that the Girls had made significant progress since their placement with her and exhibited positive functioning. All three Children exhibited multiple bonding behaviors toward maternal grandmother and were relaxed and comfortable with her. The Girls reported that living with maternal grandmother was good and that she had taken the best care of them, including ensuring that they were always safe and fed. Child 1 asked maternal grandmother if she would adopt them. Child 3 was developmentally on target and exhibited positive behavioral functioning. He also was very connected to maternal grandmother and exhibited primary attachment to her, as he had ever only known maternal grandmother as his caregiver and her home as his. Maternal grandmother was very knowledgeable and informed about the Children. She was comforting and empathetic toward them. She was concerned about their best interests and consistently expressed her desire to care for them permanently.

The Girls reported to Dr. Pepe that living with Mother had been hard. They did not have enough food; Mother had a lot of people in the home and they did not feel safe with her. The Girls remembered being beaten by Mother.

---

misconduct to justify a claim that the court erred in involuntary terminating her parental rights. We agree with the court's observation that "[g]iven the facts of this matter, [it] was justified in reaching its conclusion without such an evaluation." (Orphans' Ct. Op., at 11 n.35) (citing **In re K.K.R.-S.**, 958 A.2d 529, 533 (Pa. Super. 2008) ("In analyzing the parent-child bond, the orphans' court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert.")).

Child 2 had some continuing attachment to Mother but stated that she also knew that she would be safer with maternal grandmother. Dr. Pepe testified that the Girls had expressed care and concern for Mother and "hoped that she would, quote, get herself together. But [they] stated that they wanted to remain with their grandmother permanently" and knew she would always keep them safe. Dr. Pepe opined that if the Girls continue to feel they are responsible for ensuring Mother's safety, as might be deduced from their daily attempt to call Mother to ensure she is safe, this could have a long-term negative effect on their mental health.

Dr. Pepe explained that for Child 3, who has been in maternal grandmother's care since birth, consistent visitation by Mother was essential to the development of a meaningful parent-child relationship. She also noted that a primary attachment is very important in helping children develop a sense of who they are and their sense of environment. If a child does not have that sense of connection with someone important, they are at risk of extensive behavioral and psychological problems. She opined that removing the Children from maternal grandmother with whom they were happy and safe and with whom they had a primary attachment would be very difficult for them.

On June 4, 2021, the orphans' court issued an order terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(2), (8). It concluded that terminating Mother's parental rights best served the

Children's needs and welfare pursuant to 23 Pa.C.S. § 2511(b). Mother timely appealed and filed a contemporaneous statement of errors complained of on appeal. *See* Pa.R.A.P 1925(a)(2)(i), (b).

Mother raises one issue for our review: "Did the trial court abuse its discretion and/or err as a matter of law in concluding that termination of Natural Mother's parental rights would serve the needs and welfare of the Children pursuant to 23 Pa.C.S. § 2511(b)?"[4] (Mother's Brief, at 9). She maintains that there was not clear and convincing evidence that termination of parental rights would best serve the needs and welfare of the Children. She argues that the court improperly utilized a "fault based analysis" and her

_____

[4] Our standard of review of this matter is well-settled:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re M.M.*, 106 A.3d 114, 117 (Pa. Super. 2014) (citation omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id.* (citations omitted).

conclusion that severing the bond between Mother and the Children would not be detrimental to them is different from finding that termination would best serve their needs and welfare. (**See id.** at 19-20).

## II.

## A.

"In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid." **In re M.M.**, supra at 117 (citation omitted). Clear and convincing evidence is "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **Id.** (citation and internal quotation marks omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. **See** 23 Pa.C.S. § 2511. It requires a bifurcated analysis "in which [the court] initially focuses on the conduct of the parent under Section 2511(a). "If the trial court determines that the parent's conduct warrants termination under Section 2511(a), it must then engage in an analysis of the best interests of the child under Section 2511(b)." **In re M.M.**, **supra** at 117 (citations omitted).

Instantly, Mother concedes that CYF met its burden of proof under 23 Pa.C.S. § 2511(a)(2), (**see** Mother's Brief, at 16-17), and only challenges the orphans' court's conclusions with respect to Section 2511(b), which provides:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

When considering Section 2511(b), "the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted). "[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *In re M.M.*, *supra* at 118 (citation omitted); *see also In re T.D.*, 949 A.2d 910, 920–23 (Pa. Super. 2008), *appeal denied*, 970 A.2d 1148 (Pa. 2009) (affirming the termination of parental rights where "obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood," and where preserving the parents' rights would prevent T.D. from being adopted and attaining permanency.). "[A] parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of

- 11 -

[the child's] potential in a permanent, healthy, safe environment." ***In re B.,*** ***N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (internal citations omitted). It is sufficient for the orphans' court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. ***See In re*** ***Z.P.***, ***supra*** at 1121.

**B.**

The orphans' court explains:

> Given the evidence, the court … inferred that the Girls' bond with Mother is neither necessary nor beneficial. The court further … inferred that [Child 3] is not likely to have any bond with Mother at all. The court … concluded that severing whatever bond the Children have with Mother will not be detrimental to them.
>
> Mother's involvement in the Children's lives has been inconsistent and unreliable. Mother did not attend coached visits or visits scheduled by CYF and does not have a set visitation schedule with the Children. Mother continues to be in need of mental health treatment and drug and alcohol treatment, per her court-ordered goals. Given Mother's failure to maintain frequent and reliable contact with the Children and her lack of progress toward her goals, the court … concluded that the Children's need for safety, permanency, and stability outweighs the possible benefit of maintaining their relationship with Mother.

(Orphans' Ct. Op., at 10-11) (footnote and unnecessary capitalization omitted). We discern no abuse of discretion.

We note first that while we agree with Mother that determining whether a parent's conduct justifies termination under Section 2511(a) is distinct from the needs and welfare analysis of Section 2511(b), we disagree that evidence of a parent's conduct is always inapplicable to the needs and welfare analysis

and that, therefore, the orphans' court erroneously applied a fault-based and best-interest analysis. (***See*** Mother's Brief, at 18-20). It is well-settled that in determining needs and welfare, a court properly considers whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights. ***See In re Adoption of J.N.M.***, 177 A.3d 937, 946 (Pa. Super. 2018), *appeal denied*, 183 A.3d 979 (Pa. 2018) (orphans' court did not err by prioritizing children's safety and security needs over their relationship with mother where bond was unhealthy and record did not indicate they would suffer extreme emotional consequences); ***In re A.C.S.***, 2019 WL 3458771, unpublished memorandum, at *5 (Pa. Super. filed July 31, 2019) (finding needs and welfare of children best served by severing bond where mother failed to resolve parenting deficiencies and adoption would offer children permanency);[5] ***In re M.M.***, ***supra*** at 120 (Pa. Super. 2014) (concluding the detriment to children in severing bond with mother was outweighed by safety and security needs). Therefore, Mother's argument that the court applied the wrong analysis lacks merit.[6]

_____

[5] Unpublished memoranda filed after May 1, 2019, may be cited for their persuasive value. ***See*** Super. Ct. IOP § .37(B).

[6] Nor are we persuaded by Mother's reliance on ***In re Adoption of R.J.S.***, 901 A.2d 502 (Pa. Super. 2006), and ***In re Coast***, 561 A.2d 762 (Pa. Super. 1989) (*en banc*), *appeal denied*, 575 A.2d 560 (Pa. 1990). (***See*** Mother's Brief, at 18-19). As noted by CYF, neither case stands for the proposition that
*(Footnote Continued Next Page)*

- 13 -

Further, the court's decision is supported by the record. The Girls have lived with maternal grandmother for over three years and Child 3 has lived with her for two, nearly his whole life. (*See* N.T. Hearing, 4/08/21, at 172, 176, 181). Child 3 knew only maternal grandmother as his caregiver. Dr. Pepe opined that frequent and consistent contact with Mother was essential for Child 3 to build a bond with her, but Mother has failed to frequently or consistently visit him, despite opportunities to do so. (*See id.* at 69-70).

Although the Girls do still have some connection with Mother, the evidence suggests that it negatively affects them. (*See id.* at 62-63). The Girls described significant bad experiences with Mother, such as not having enough food, being beaten, being frightened and feeling unsafe. (*See id.* at 54-56, 60). Maternal grandmother described a history of conflict with Mother in front of the Children, including arguing, fighting, intoxication and, in May 2021, threats she would kill maternal grandmother. The Girls reported to Dr. Pepe that they understood Mother did not have herself together and that she would not be able to keep them safe. (*See id.* at 60-62). They told Dr. Pepe that maternal grandmother takes the best care of them and they feel safe with

---

a parent's conduct that justified termination was irrelevant to the needs and welfare analysis as Mother argues. (*See* CYF's Brief, at 21). We agree that the cases "merely confirm the long-held rule that explicitly rejects a balancing or best interest approach to determining whether the statutory prerequisites of termination of parental rights have been met pursuant to [Section] 2511(a)." (*Id.*); *see also In re R.J.S.*, *supra* at 508 (observing needs and welfare analysis of Section 2511(b) is irrelevant to initial Rule 2511(a) analysis of parent's conduct); *In re Coast*, *supra* at 766 (same).

her, unlike with Mother. (*See id.* at 54-56, 60-61). Dr. Pepe noted that the Girls feel responsible for Mother's safety, which could have long-term negative effects on their mental health and could be debilitating if they were in her home. (*See id.* at 62). Although the Girls were concerned about Mother's well-being, both told Dr. Pepe that they wanted to be adopted by maternal grandmother, with Child One asking her to adopt them during one of the evaluations. (*See id.* at 59, 62).

While living with their maternal grandmother, all three Children have made progress and done well in her care. The Children have a primary bond with her and look to her to meet all their needs, which she does. (*See id.* at 54-55, 61, 69). Dr. Pepe testified that maternal grandmother was comforting to the Children, concerned for them, and consistently stated that she wanted to care for them permanently. (*See id.* at 61). She is an adoptive resource that would provide stability and is an "appropriate permanent placement for the Children." (*Id.* at 54; *see id.* at 61, 176, 181).

Based on the foregoing, the court's findings are supported by evidence presented at the hearings. Furthermore, we defer to the court's credibility determinations and discern no abuse of discretion in its findings. Accordingly, we conclude that the court did not abuse its discretion in terminating Mother's parental rights to the Children pursuant to Section 2511(b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/15/2021</u>