J-A25043-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.A.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 726 WDA 2023 |

Appeal from the Order Entered May 23, 2023
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s):  OC 10A-2023

BEFORE:   BOWES, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED: April 5, 2024**

C.L. ("Mother") appeals from the May 23, 2023 order of the orphans' court terminating her parental rights to L.A.S., born in 2013 ("Child").  After careful review, we affirm.

Mother and T.S. ("Father," collectively "Parents") have a long history with Jefferson County Children and Youth Services ("Agency") involving numerous incidents dating back to 2007, but the present case began in April 2022 when Indiana County Children and Youth Services ("ICCYS") received a report that Parents had violated a safety plan implemented by ICCYS that Child should have no contact with her brother, T.S. ("Brother").  ICCYS had previously found Brother, who was approximately 23 years old at the time of the termination hearing, to be an indicated perpetrator of child abuse, based

_____

[*] Retired Senior Judge assigned to the Superior Court.

upon the sexual abuse of Child,[1] and reported the violation of the safety plan to the Agency. The Agency investigated and discovered that Brother remained living in the family home with Child.

As a result of the investigation, Child was removed on May 28, 2022, and placed in foster care. In June 2022, a family service plan was implemented requiring Parents to address mental health needs, improve parenting skills, ensure that Child has no contact with Brother, and maintain communication with the Agency. Parents were permitted visitation with Child in July 2022, but that visitation was suspended in September 2022. Following a permanency review hearing on December 5, 2022, Child's placement goal was changed to adoption. Parents submitted to clinical interviews with Dr. Carolyn Menta, a clinical psychologist, in January 2023, and Dr. Menta completed psychological assessments of Parents in March 2023.

On March 23, 2023, the Agency filed termination petitions as to Mother and Father's parental rights to Child. A hearing was held before the orphans' court on both petitions on May 9, 2023, at which Joanna Welch, an Agency caseworker, and Dr. Menta testified.[2]

_____

[1] Under the Child Protective Services Law, an agency may find a report of child abuse to be "indicated," if after an investigation, the agency determines that there is substantial evidence of the alleged abuse. 23 Pa.C.S. § 6303(a).

[2] Child was represented in these proceedings by a guardian *ad litem* and separate legal interests counsel. ***See In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020) (appellate courts must engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of a child in a contested termination proceeding).

At the hearing, Welch testified that Parents had not been compliant with the family service plan that was put into place when Child was removed from the home in May 2022 and that services provided by the Agency have not been effective in remedying the conditions that led to Child's removal. N.T., 5/9/23, at 6-7, 9, 14. The family service plan required Parents to address their mental health needs, improve their parenting skills, ensure that Child have no contact with Brother, and maintain communication with the Agency. *Id.* at 6. Welch stated that Parents completed their psychological evaluations with Dr. Menta in January 2023, six months after they were ordered to do so, and as of the date of the hearing, they had not followed through with Dr. Menta's recommendations that they engage in trauma and couples therapy. *Id.* at 9, 13-14, 17, 31.

Welch stated that visitation between Parents and Child was halted in September 2022 due to the abuse investigation, and then in October 2022, Child's mental health providers further recommended that no visitation occur; the cessation in visitation continued as of the date of the termination hearing. *Id.* at 8-9, 15-16. Welch indicated that Parents have failed to provide Child with any resources, such as clothes or other support, since her removal. *Id.* at 13, 21. Welch testified that Parents had not completed their required parenting skills course, although this was due to the fact that this service requires observation of the parent's interaction with the child, which was halted in this case due to Child's disclosure of abuse. *Id.* at 9, 32.

Welch explained that Parents had failed to comply with the family service plan goal of maintaining regular contact with the Agency since the case opened. *Id.* at 7. She stated that Parents had only sporadically contacted the Agency or Child's foster parents to inquire about Child. *Id.* at 10, 13, 37. Similarly, while the Agency had been informed that Brother had moved out of the family home in early May 2023, that was based upon information provided by a service provider, rather than a firsthand report from either parent. *Id.* at 18-19, 27. Therefore, neither Welch nor any other representative of the Agency had been permitted to visit the property to verify that Brother was no longer residing there. *Id.* at 8, 22-23, 37-38. Separately, the Agency has been unable to access the family home to ensure that it was a safe and appropriate place for Child to live even though a large crack was visible in the roof of Parents' current residence, leading the Agency to have "significant concerns about [its] structural integrity." *Id.* at 7-8, 14, 28.

Notwithstanding Brother's apparent departure from the family home, Welch testified that the issue that led to Child's removal—Parents' lack of protective capacity of Child—continued to persist as of the date of the termination hearing. *Id.* at 9-10, 14, 32-33, 38-39. Welch further opined that Parents have failed to "recognize the harm" to Child that resulted from Brother's contact with Child in the past. *Id.* at 14. Welch noted that the issues related to Brother's abuse of Child existed "way before the filing of" the termination petitions or even Child's removal and therefore, Parents have long been on notice of the safety concerns related to Child. *Id.* at 28, 38-39.

Welch stated that, with respect to Mother, the Agency still harbored concerns that she would permit Brother to be in Child's presence in the future. *Id.* at 14.

Welch testified that Child's foster parents, who had been caring for Child for approximately one year as of the date of the termination hearing, were ensuring Child's safety and meeting her physical, developmental, and emotional needs. *Id.* at 6-7, 10-11, 13. Welch stated that Child "is very settled and stable[]" and "doing very well" in the foster home and she has developed relationships with other children in her new neighborhood. *Id.* at 10, 32. Child has also begun to refer to her foster parents as "mom and dad." *Id.* at 11.

Welch explained that Child is attending school regularly and "doing the best that she can do" in school since her placement. *Id.* at 10-11. Child has an intellectual disability with secondary speech and language impairment, which was only diagnosed after she was removed from Parents, and she now has an individualized education plan at school that will ensure that her instruction is adapted to her capabilities. *Id.* at 11-12. Welch stated that, prior to Child's removal, she had instable housing—moving multiple times— and irregular school attendance. *Id.* at 12.

Welch testified that the foster parents have also ensured that Child attends regular counseling sessions to address her sexual assault trauma. *Id.* at 12. According to Welch, the therapy has been beneficial to Child, which has allowed her to recently step down in the frequency of her treatment. *Id.*

Welch stated that Child's "mental health has taken quite [some] time to unpack but we are starting to begin to see [Child] . . . make some forward progress in her trauma therapy." *Id.* Welch further testified that, although Child had expressed that she missed Parents to her mental health providers in November 2022, Child did not ask about Parents during Welch's more recent meetings with Child, including on the day before the termination hearing. *Id.* at 32. Welch further stated that Child had not asked about resuming visitation with Parents and she did not indicate a preference for reunification with Parents when asked. *Id.*

Dr. Menta, who was qualified as an expert in psychological testing, testified that she conducted a clinical interview of Mother in January 2023 and prepared an assessment report of Mother; however, Mother left before completing the full testing and did not schedule another appointment. *Id.* at 41-44, 60; CYS Exhibit 1 at 1, 8. Dr. Menta noted that Mother recounted her own personal history of trauma and victimization in childhood and stated that Mother acknowledged that Brother had abused Child's older sister, and Mother also indicated that Brother himself had been abused by extended family members. N.T., 5/9/23, at 44-46.

Dr. Menta's principal concern with Mother was that "she seemed to prioritize [Brother's] feelings about the situation over [Child's] feelings," leading Dr. Menta to opine that Mother does not have the ability to protect Child in the future. *Id.* at 44-46, 48. Therefore, Dr. Menta did not recommend reunification with Child. *Id.* at 48. Dr. Menta stated that Mother's history of

trauma caused her to "normalize[] the sexual abuse in th[e] family" and further noted that she had difficulty setting limits for Brother. *Id.* at 45, 47. Dr. Menta opined that Mother suffers from generalized anxiety disorder, post-traumatic stress disorder, and major depressive disorder. *Id.* at 47. Dr. Menta's recommendations for Mother were to undergo therapy to address her personal trauma and to also participate in couples therapy with Father. *Id.* at 46.

Following the hearing, on May 23, 2023, the orphans' court issued an order terminating Mother's parental rights and a supporting opinion. On that same date, the court entered an order terminating Father's parental rights.[3] Mother filed a timely notice of appeal and concurrently filed a concise statement of errors complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i).

Mother raises four issues on appeal:

1. Whether the Trial Court erred or committed an abuse of discretion in terminating Appellant's parental rights under 23 Pa.C.S.[] § 2511(a)(1)?

2. Whether the Trial Court erred or committed an abuse of discretion in terminating Appellant's parental rights under 23 Pa.C.S.[] § 2511(a)(2)?

3. Whether the Trial Court erred or committed an abuse of discretion in terminating Appellant's parental rights under 23 Pa.C.S.[] § 2511(a)(5)?

_____

[3] Father also filed an appeal from the order terminating his parental rights, which is docketed at 727 WDA 2023.

4. Whether the Trial Court erred or committed an abuse of discretion in terminating Appellant's parental rights under 23 Pa.C.S.[] § 2511(b)?

Mother's Brief at 5 (suggested answers omitted).

In addressing these issues, we apply the following precepts:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary

termination[.]" ***In re Adoption of C.M.***, 255 A.3d 343, 359 (Pa. 2021); ***see*** 23 Pa.C.S. § 2511(a)(1)-(11).  If the orphans' court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare.  ***T.S.M.***, 71 A.3d at 267.

Here, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), and (5), and subsection (b).  However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  We focus our analysis on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \*          \*          \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \*          \*          \*
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

> income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

Under Section 2511(a)(2), "the moving party must prove by clear and convincing evidence that there is (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of L.A.K.*, 265 A.3d 580, 600 (Pa. 2021).

> [S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and emphasis omitted).

The grounds for termination under Section 2511(a)(2) are not limited to affirmative misconduct, but also include refusal and parental incapacity that cannot be remedied. *Id.*; *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443; *see also In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019)

(*en banc*), **affirmed**, 240 A.3d 1218 (Pa. 2020) (noting that a parent has an "affirmative duty" to work towards the return of her children, which requires, at a minimum, that she "cooperate with the Child and Youth Agencies and complete the rehabilitative services necessary so that the parent can perform [her] parental duties and responsibilities"). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **Z.P.**, 994 A.2d at 1118 (citation omitted). "[W]hen a parent has demonstrated a continued inability to conduct [her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." **Id.** (citation omitted).

Once a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), the court turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." **T.S.M.**, 71 A.3d at 267 (citation and quotation marks omitted); **see also In the Interest of K.T.**, 296 A.3d 1085, 1106 (Pa. 2023). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical,

and emotional needs and welfare above concerns for the parent." ***K.T.***, 296 A.3d at 1105.

Our Supreme Court has consistently mandated that any Section 2511(b) analysis "requires consideration of the emotional bonds between the parent and child." ***T.S.M.***, 71 A.3d at 267 (citing ***In re E.M.***, 620 A.2d 481 (Pa. 1993)). Specifically, "[c]ourts must determine whether the trauma caused by breaking [the parent-child] bond is outweighed by the benefit of moving the child toward a permanent home." ***Id***. at 253 (cleaned up). The recognized threshold for this required bond inquiry is whether termination will sever a "necessary and beneficial relationship," causing the child to suffer "'extreme emotional consequences' or significant, irreparable harm." ***K.T.***, 296 A.3d at 1109-10 (quoting ***E.M.***, 620 A.2d at 484).

"[A] court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." ***K.T.***, 296 A.3d at 1113. Our Supreme Court has explained that the court should consider, as appropriate, the child's need for permanency and length of time in foster care, the child's placement in a pre-adoptive home and whether there is a bond with the foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs. ***Id.*** Nonetheless, there is no "exhaustive list" of factors that must be considered by an orphans' court in this context. ***Id.*** at 1113 n.28.

We first address the orphans' court's determination that termination was proper under Section 2511(a)(2). The orphans' court found that Brother's presence alone did not demonstrate Mother's parental incapacity under Section 2511(a)(2) but that

> it was instead the mindset that prompted Mother . . . to continue exposing [Child] to [Brother] even after [she] knew or had reason to know that he had molested her. Brother's presence was merely emblematic of [her] inability to recognize an imminent danger and protect [her] daughter from it. "Parental incapacity," in this case, meant "lack of protective capacity," and that was not alleviated by Brother moving to a different location [days prior to the termination hearing].

Orphans' Court Opinion, 5/23/23, at 6-7. The court explained that Mother evinced parental incapacity based upon her "continual[] prioritiz[ation of her] adult son[, Brother,] over [her] minor daughter[, Child,] allowing him to live in [her] home, where he would have constant access to" Child. *Id.* at 7. While the court noted that Brother had recently left the home, this fact "did not mitigate" Mother's failure to protect Child "because [she] *knew* Brother's departure was an absolute prerequisite to [Child] returning home." *Id.* at 8 (emphasis in original).

The orphans' court noted that although the Agency developed a family service plan to assist Mother in developing her protective capacity and regain custody of Child, Mother "continuously made decisions that distanced [her] farther and farther from reunification." *Id.* at 7. Mother's failures included cutting off communication with the Agency, "stubbornly cho[osing] silence," even though "sever[ing] communication with" the Agency meant "sever[ing

- 13 -

her] remaining avenue of access to" Child. *Id.* Mother also failed to allow the Agency access to the family home to verify that it was safe and habitable for Child. *Id.* at 3.

The orphans' court recognized that Mother did not have a "meaningful opportunity to seek the follow-up treatment Dr. Menta recommended" in her March 2023 report. *Id.* at 3. However, the court noted that the failure to receive recommendations from Dr. Menta was a consequence of Mother's six-month delay in scheduling the evaluation. *Id.* at 8. The court observed that the scheduling delay, as well as her failure to fully complete the testing required of her by Dr. Menta, called into question Mother's "willingness to do what was necessary to prove that [she] could *and* would do what was necessary to become [a] fit parent[] and regain custody of" Child." *Id.* (emphasis in original). The court concluded that, based upon Mother's history and Dr. Menta's assessment, it was not expected that Mother "will be able to remedy . . . her parental shortcomings any time soon." *Id.* "Even if [she] did," the court stated, "the journey toward rectifying the causes of [her] parental incapacity would leave [Child] without the hope of permanency for an unconscionable length of time." *Id.*

Mother argues that the record at the termination hearing did not demonstrate that she had a "permanent, protective incapacity" as a parent. Mother's Brief at 12. She recounts Dr. Menta's testimony at the parental incapacity hearing that, if Mother complied with Dr. Menta's recommendations in the March 2023 evaluation report, "it could improve things," that if Mother

is "motivated for treatment" she "could establish healthier boundaries," and that progress could be seen in "as little as a few months." N.T., 5/9/23, at 62-64. Mother argues that her self-reported participation in psychological counseling and her recent eviction of Brother from the family residence "clearly displays her motivation for treatment and overcoming any incapacity." Mother's Brief at 13. Mother contends that she "has a surmountable challenge in rebuilding her protective capacity, but she has undoubtedly been thwarted by the lack of disclosure of beneficial treatments." *Id.* She asserts that her "actions do not reflect that of an unmotivated parent facing a permanent incapacity." *Id.*

We conclude that the orphans' court's findings are supported by clear and convincing evidence and that the court did not err in determining that Mother had a continuing parental incapacity to protect Child, that the incapacity caused Child to be without essential parental care, and that the cause of the incapacity cannot or would not be remedied. 23 Pa.C.S. § 2511(a)(2); *L.A.K.*, 265 A.3d at 600. There was ample testimony at the termination hearing establishing that Mother lacked protective capacity to care for Child and that she was unable to remedy her parental incapacity. Dr. Menta opined, following a clinical interview and the preparation of a psychological assessment of Mother, that Mother lacked the ability to protect Child. N.T., 5/9/23, at 41-46, 48; *see also* CYS Exhibit 1. Mother acknowledged during her clinical interview that Brother had abused Child, as well as Child's older sister, over the course of several years but continued to

prioritize Brother's feelings over Child, leading Dr. Menta to conclude that Mother had normalized the abuse in the family and that there was little prospect that Mother could ever develop the ability to protect Child. *Id.* at 44-47. Dr. Menta thus concluded that she could not recommend Mother's reunification with Child. *Id.* at 48.

Moreover, as the orphans' court stated, Mother's interactions with the Agency reinforced that she was incapable of remedying her parental incapacity. While the Agency was made aware that Brother did move out of the family home, he did not do so until after the termination petition was filed and just days prior to the hearing, and the Agency only found this information out through a third party. *Id.* at 8, 18-19, 22-23, 27, 37-38. This was illustrative of Mother's general inability to maintain regular contact with the Agency: Mother had only sporadically contacted the Agency and Child's foster parents, she did not provide Child with any resources during the course of the case, and she failed to provide the Agency with access to her home to ensure it was safe for Child. *Id.* at 7-8, 10, 13-14, 28, 37. Welch's interactions with Mother led her to conclude that Mother's lack of protective capacity of Child continued to persist as of the date of the termination hearing and that Mother still failed to appreciate the harm done to Child and would continue to allow Brother to be in Child's presence in the future. *Id.* at 9-10, 14, 32-33, 39.

While Mother argues that her eviction of Brother demonstrated that she had taken steps to remedy her incapacity, we find no abuse of discretion in the orphans' court's assessment that this action on the eve of the termination

hearing did not mitigate Mother's refusal to do so when Child was removed or up to the date that the termination petition was filed. Orphans' Court Opinion, 5/23/23, at 7-8; **see also Z.P.**, 994 A.2d at 1118 (noting that a parent's vow to cooperate after a long period of uncooperativeness may be rejected as untimely or disingenuous). Furthermore, although Mother contends that she could not comply with Dr. Menta's recommendation that she engage in couples and trauma therapy since she did not receive Dr. Menta's report until shortly before the termination hearing, the record supports the orphans' court's finding that Mother's inability to follow the recommendations was a result of her six-month delay in participating in the clinical interview. Orphans' Court Opinion, 5/23/23, at 8; N.T., 5/9/23, at 24-25, 31.

Moreover, we observe that, while Dr. Menta recognized that therapy "could improve things" for Mother and allow her to develop healthier boundaries and protective capacity for Child, Dr. Menta explained that any advancement could take years or may never occur, which would be an unreasonable delay in Child achieving permanence and stability. N.T., 5/9/23, at 62-65; **see also In the Matter of M.P.**, 204 A.3d 976, 983 (Pa. Super. 2019) (stating that a child's life "cannot be held in abeyance" and her "need for permanence and stability" indefinitely subordinated to a parent's "attempts to attain the maturity necessary to assume parenting responsibilities") (citation omitted). Finally, we note that, while Mother argues that she has taken steps to remedy her incapacity by beginning to attend therapy, there was no evidence submitted at the hearing to support this claim, and Welch

denied that the Agency was in possession of any information showing that Mother was engaged in therapy.  N.T., 5/9/23, at 24-25, 30.

We accordingly find that the Mother's appellate claim with respect to Section 2511(a)(2) merits no relief.  We thus shift our focus to the orphans' court's determination that termination was appropriate under Section 2511(b).

Mother argues that the orphans' court did not sufficiently analyze the bond between her and Child.  Notwithstanding the court's determination, Mother notes Child's statement to a mental health care provider in November 2022 that she missed Parents and wanted Brother to move out so that she could return home, N.T., 5/9/23, at 26, and contends that this statement[4] shows that Child "is still holding onto . . . desires" to see and speak with Mother, "which speaks to a bond that needs more evaluation before being so quickly severed."  Mother's Brief at 16.  Mother asserts that Dr. Menta or another professional should have performed a bonding assessment in this case, which would have shown that preserving the Mother-Child bond would best serve Child's needs and welfare.  We disagree.

---

[4] In her brief, Mother refers to another apparent statement by Child that she wanted to speak to her "mom" during a counseling session, Mother's Brief at 16, but this alleged statement was not mentioned at the termination hearing nor is there any other evidence of such a statement in the certified record. Therefore, we may not consider this additional statement in this appeal. **See In re J.C.**, 5 A.3d 284, 288 (Pa. Super. 2010).

In addressing subsection (b), the orphans' court concluded that terminating Mother's parental rights will not sever a necessary and beneficial bond that would cause Child to suffer detrimental consequences. Orphans' Court Opinion, 5/23/23, at 8-9. The court noted that Child's life before her removal was "punctuated by chaos and instability," as a result of her "transient housing situation" and the "constant threat of abuse" that she faced because her caregivers did not protect her from Brother. *Id.* at 4. The court observed that Child "has grown up knowing that [P]arents will not keep her safe from Brother" and that this has "create[d] conflicting emotions and inflicts further harm" on her. *Id.* at 9. The court added that "[w]hether or not it was once her desire to return home," the testimony at the hearing demonstrated that the bond had diminished as Child had ceased asking the Agency caseworker about Parents and did not express a preference for reunification when she met with Welch the day before the termination hearing. *Id.* at 5, 9.

The orphans' court further noted that "[i]n all other respects, termination will only benefit" Child. *Id.* at 9. The court stated that the foster parents provide for Child's physical, emotional, and developmental needs and provide her a safe and settled home where she will not be in the presence of her abuser. *Id.* at 4-5, 9. Further, the foster parents capably ensure that Child is attending school according to an individualized plan, receiving trauma-based mental health therapy, and developing friendships within her new neighborhood. *Id.* The court noted that the fact that Child refers to foster

parents as "mom" and "dad" demonstrates that she feels safe and loved in their care and that they have assumed a primary place in her life. *Id.* at 5, 9. The court concluded that "[i]f Mother and Father's rights are terminated, [f]oster [p]arents can then adopt [Child], making her a permanent part of their family and ensuring that she will continue to receive the care, love, and comfort she has received since becoming their foster daughter." *Id.* at 9.

We find no abuse of discretion in the orphans' court's analysis under Section 2511(b). While Mother contends that the Agency should have enlisted Dr. Menta to conduct a bonding assessment, it is well-settled that a formal bonding evaluation is not required under subsection (b). *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018); *Z.P.*, 994 A.2d at 1121. Expert testimony is not required concerning a parent-child bond, and the court may rely on the opinion of social workers and caseworkers. *J.N.M.*, 177 A.3d at 945; *Z.P.*, 994 A.2d at 1121. The orphans' court here relied on the testimony of Welch, the Agency caseworker, concerning Child's diminishing attachment to Parents over the course of the case and her waning interest in resuming visitation. N.T., 5/9/23, at 32.

In any event, we note that the lower court recognized that a bond existed between Mother and Child and that Child would suffer some negative consequences from the severance of the parent-child relationship. However, in this case the court gave precedence to Child's safety over the parent-child bond. We have recognized that, in addition to a consideration of the parent-child bond, "the [orphans'] court can equally emphasize the safety needs of

the child" under Section 2511(b) and may assess "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." **Interest of M.E.**, 283 A.3d 820, 837 (Pa. Super. 2022) (quoting **In re M.M.**, 106 A.3d 114, 118 (Pa. Super. 2014), and **L.W.**, 267 A.3d at 524). It is within the orphans' court's discretion "to prioritize the safety and security needs of" a child over the bond with her parent, "and this Court will not interfere with the court's assessment when its factual findings are supported by the record." **M.E.**, 283 A.3d at 839; see also **L.W.**, 267 A.3d 517, 524; **J.N.M.**, 177 A.3d at 946. The record here provides ample support for the orphans' court's findings with respect to Child's safety needs.

Finally, we observe that the orphans' court's determination that foster parents were attending to Child's physical, emotional, and developmental needs, as well as ensuring that Child was regularly attending school and receiving trauma-based mental health therapy, is well-supported by the testimony at the termination hearing. N.T., 5/9/23, at 6-7, 10-12, 13, 32; see **K.T.**, 296 A.3d at 1113. We thus find no merit to Mother's argument that the orphans' court abused its discretion in finding that termination of Mother's parental rights best served Child's needs and welfare. Having rejected Mother's challenges under both subsections of Section 2511 of the Adoption Act, we affirm the order terminating Mother's parental rights to Child.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 04/05/2024