J-S40031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1074 EDA 2023 |

Appeal from the Order Entered March 22, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0003191-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1075 EDA 2023 |

Appeal from the Decree Entered March 22, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000458-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1076 EDA 2023 |

Appeal from the Order Entered March 22, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0003192-2017

J-S40031-23

| IN THE INTEREST OF: A.M.A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | |
| | : | |
| | : | No. 1077 EDA 2023 |

Appeal from the Decree Entered March 22, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000457-2020

BEFORE: NICHOLS, J., SULLIVAN, J., and COLINS, J.*

MEMORANDUM BY COLINS, J.: **FILED MAY 3, 2024**

Appellant, A.D. ("Father"), appeals from the March 22, 2023 decrees of the trial court that terminated his parental rights to his children, A.J.D. and A.M.A.D. (collectively, "Children"). Father also appeals from the March 22, 2023 trial court orders that changed the permanent placement goal for Children to adoption. After careful review, we affirm.

By way of background, the Department of Human Services of the City of Philadelphia ("DHS") received its first report, a general protective service report,[1] on September 26, 2017, alleging that Father had engaged in domestic

_____

* Retired Senior Judge assigned to the Superior Court.

[1] Pennsylvania law defines two types of reports received by county agencies. A "general protective service report" is "[a] verbal or written statement to the county agency from someone alleging that a child is in need of general protective services[,]" with those services being designed to prevent the potential for harm to a child who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary
*(Footnote Continued Next Page)*

- 2 -

violence, physical abuse, and inappropriate discipline in the Children's household. *See* N.T., 4/18/18, at 37-39. At that point in time, A.J.D. was three years old and A.M.A.D. was one year old. In addition to the Children, five maternal half-siblings resided in this household with Father and B.S. ("Mother"). DHS validated the report through one of the Children's half-siblings, who indicated that she was fearful of Father because, *inter alia*, he beat her with a cord and broom.[2] *See id*., at 38-40.

Notwithstanding this report, evidence suggested that Father had moved out of the same residence as Mother and the Children.[3] *See id*., at 40 (DHS investigator stating that she "was told that [Father] was not [living in the home]"). Because of this apparent departure, DHS kept the Children in Mother's house and implemented Community Umbrella Agency ("CUA")

---

for his physical, mental, or emotional health, or morals." 55 Pa. Code § 3490.223(i). In contrast, a "child protective report" is made by someone who has "reasonable cause to suspect that a child has been abused." 55 Pa. Code § 3490.11(a).

[2] Throughout the course of its investigation, DHS also learned that Mother had once tried to obtain a Protection from Abuse ("PFA") Act order against Father. *See* N.T., 4/18/18, at 42. Although she never expressly admitted that she had been abused, Mother implied that she was afraid of Father. *See id*., at 41. Other women, too, have initiated PFA proceedings against Father. *See id*., at 44. Father also has a prior conviction for involuntary manslaughter of a former paramour.

[3] Father's place of living remained unclear throughout sizable portions of the proceedings, with Father's attorney conveying to the court that he lived, at various points, in Johnstown, Pennsylvania, as well as Philadelphia.

services in the family's home. *See id*., at 41 (remarking that there was no "imminent need to remove the children" at the time).

In October 2017, DHS received a second report, a child protective report, primarily alleging that Father had punched one of the Children's half-siblings at some undefined point. *See id*., at 44-45. The half-sibling stated that "she received a black eye from this [incident]." *Id*., at 46. Father denied that he was physically abusive, *see id*., at 47 (Father also denying that he was committing any domestic violence), but despite indicating that he was no longer living with Mother, he did not provide an updated address. *See id*., at 49 (during the DHS investigation, Father was "just there, babysitting"). Mother denied that there was any physical abuse occurring to any of her children. *See id*., at 49. Eventually, after further investigation, DHS filed dependency petitions for the Children. *See id*., at 48.

In December 2017, there was a third report directed to DHS alleging domestic violence. *See id*., at 55. However, when several of the Children's half-siblings were interviewed by DHS, other than providing vague intimations of improper conduct, they were unwilling to speak about their home life. *See, e.g.*, *id*., at 56 (one of the half-siblings demeanor described as "[v]ery guarded"), 59 (another of the half-siblings stating that although she did not want to speak to DHS, "she felt it was best if the kids were removed from the home[]").

Ultimately, on December 11, 2017, DHS obtained orders of protective custody ("OPC") for all seven children living with Mother due to domestic

violence concerns. ***See id***., at 59. Following a shelter care hearing, which occurred several days after the issuance of the OPCs, the Children were temporarily committed to DHS's custody.[4] ***See*** Shelter Care Order, 12/15/17, at 1-2. At this juncture, Father and Mother's visitation rights were also suspended. ***See id***., at 2.

In January 2018, DHS received a fourth report, alleging that Father had burned one of the Children's half-siblings, two years old at the time, in a bath some four years prior. ***See*** N.T., 4/18/18, at 60, 67. In response, Father admitted that he left this half-sibling unsupervised, which led to burns on that individual's foot. ***See id***., at 64. However, Father also indicated that instead of going to seek medical treatment, the family treated the half-siblings' wounds themselves. ***See id***., at 65.

On April 18, 2018, following a full hearing in which Mother and Father were represented by counsel, the court adjudicated Children and their half-siblings dependent and committed them to DHS's custody. ***See*** Order of Adjudication and Disposition, 4/18/18, at 1. Father was additionally referred for a parenting capacity evaluation and domestic violence classes. ***See id***., at 2. Father's visitation rights were also suspended until he completed domestic violence counseling. ***See id***. It was at this point that Father obtained a single case plan that indicated he should engage with the Children pursuant to the

_____

[4] The Children resided in the same pre-adoptive foster home from December 2017 onward. ***See*** N.T., 4/18/18, at 77. The other minor half-siblings were placed in kinship care. ***See id***., at 62, 77.

court order, avail himself of CUA services, and participate in domestic violence counseling, parenting classes, and anger management classes. *See id*.

Following these determinations, the court, in subsequent review hearings, continued to find Children's placement to be necessary and appropriate, with DHS and CUA making reasonable efforts to finalize their permanency plans. *See, e.g.*, Permanency Review Order, 5/15/19.

In October 2018, Father was granted line-of-sight and line-of-hearing supervised visitation, but he never progressed beyond supervised contact. Father's last visit with the Children was in March 2019. *See* Permanency Review Order, 10/29/18.

Eventually, in December 2020, DHS filed petitions to involuntarily terminate the parental rights of the Children's Mother and Father and to change the Children's permanency goal to adoption. *See* Petition for Goal Change to Adoption/Petition to Terminate Parental Rights. In May 2022, the court held a hearing to address these concerns. By this point, the Children had been in DHS's care for fifty-three months. *See* N.T., 5/18/22, at 9. Father was represented by counsel at this hearing, and Children were represented by legal interests counsel and a guardian *ad litem*.

Therein, it was established that DHS validated, through extensive investigations, four separate reports of Father engaging in domestic violence and inappropriate discipline against Mother and the Children's half-siblings. *See e.g.*, at 11-13. Moreover, CUA indicated that Father had not maintained contact with the agency, nor had he completed his domestic violence, anger

management, or parenting single plan objectives. *See id*., at 28-29. A representative of CUA opined that Father had not demonstrated the necessary protective capacity to parent the Children and had not even seen them for over two years. *See id*., at 29. Furthermore, in the opinion of the CUA case manager, the Children did not look to Father for love or support, which compelled a conclusion that they would not suffer irreparable harm if Father's parental rights were terminated and the Children's permanency goals were changed to adoption. *See id*., at 31. The Children were reported to be very happy in the foster home, and both Children looked to their foster mother for their basic needs and support. *See id*., at 30.

Ultimately, in March 2023, the trial court terminated Father's parental rights and changed the Children's goal to adoption.[5] Specifically, the court found that DHS established, by clear and convincing evidence, that termination was warranted under Sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. *See* 2511(a)(1), (2), (5), (8), (b). From the bench, the court stated:

> [Father] had both constructive and actual knowledge of his [s]ingle [p]lan objectives. The fact is co[rrob]orated by [Father's] attendance at his supervised visits. He did not comply. … He did not simply guess the correct date and time, and location to be present for these visits. He was made aware of the visitation information and [s]ingle [c]ase [p]lan objectives on multiple occasions in court by the presiding judge and … CUA.
>
> [The court was] not persuaded by his argument that his failure to

_____

[5] The trial court also terminated Mother's parental rights to Children. Mother did not appeal.

- 7 -

comply with the [s]ingle [p]lan objectives and make any progress is anyone's fault but his own.

N.T., 3/22/23, at 9-10.

Father timely appealed these determinations and has complied with his obligations under Pennsylvania Rule of Appellate Procedure 1925(b).

On appeal, Father raises seven issues for review, four challenging the trial court's involuntary termination of his parental rights to Children and three contesting the court's change of the Children's permanency goal.

In addressing his first four issues, we apply the following precepts:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to

come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination[.]" *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see* 23 Pa.C.S. § 2511(a)(1)-(11). If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court then must proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare. *See T.S.M.*, 71 A.3d at 267.

Here, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (8), and subsection (b). However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on Section 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), … the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

To terminate a parent's parental rights under Section 2511(a)(1), the petitioner "must demonstrate by competent, clear and convincing evidence [that] [t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." *In re Adoption of C.M.*, 255 A.3d 343, 363-64 (Pa. 2021) (citation and quotation marks omitted).

With respect to a parent's performance of parental duties under Section 2511(a)(1), our Supreme Court has explained as follows:

Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions and develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of

- 10 -

preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021) (internal quotation marks, brackets and internal citations omitted).

A parent's failure or refusal to perform parental duties "must be analyzed in relation to the particular circumstances of the case." *Id.* (citation omitted). Therefore, a court addressing a petition filed under Section 2511(a)(1) shall "examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citation and brackets omitted). "Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." *Id.* While courts must not engage in a mechanical application of the terms of the Adoption Act, the "most critical period for evaluation [under Section 2511(a)(1)] is six months immediately preceding the filing of the termination petition." *Id.* at 592.

In its opinion, the court found that, given his lack of progress on his single case plan and his complete absence from the Children's lives, Father unexplainably failed to perform his parental duties for a substantial amount of

- 11 -

time:

> Father never argued that he complied with or achieved his [single case plan] objectives or had made efforts to do so. The entirety of Father's argument was that he was never informed by CUA or anyone else of what his [single case plan] objectives were. … [The lower court] reviewed the certified court record for this matter and determined that Father was present in court for this matter on at least eight prior occasions between the years of 2017 and the termination hearing on May 18, 2022. He also attended two hearings by video conference during the COVID-19 pandemic. The court records indicate that a representative from CUA was present on at least five of these occasions. … Father had both actual and constructive knowledge of his [single case plan] objectives. … [Father] attended supervised visits at various points during the history of this case. The only way that Father would be aware that his visits were supervised and when and where they were to occur is if it was communicated to him by a representative of CUA. Father would have been informed of his [single case plan] objectives by both CUA and the presiding judge before whom he appeared at each of the court listings of this case.

Trial Court Opinion 7/11/23, at 7 (footnote omitted).

> Father's single plan objectives were:
>
> [t]o avail himself for family stabilization, to engage in visits with [C]hildren per the court order, to make himself available to CUA services, to make himself available to sign all needed consents and releases, to participate in domestic violence counseling …, to participate in parenting classes and to participate in anger management classes.

N.T., 5/18/22, at 28. However, Father did not attend any of these classes or programs. *See id*., at 29. Furthermore, Father's last visit with the Children was in March 2019. *See id*., at 29, 50. As stated, *supra*, the petition to terminate Father's parental rights was filed in December 2020.

> Other than baldly stating that he "never failed or refused to perform his

parental duties," Father's Brief, at 14, Father's only argument on appeal pursuant to Section (a)(1) is that the CUA case manager's testimony, which established that Father "had not visited with the [C]hildren since March of 2019[,]" *id.*; *see also* N.T., 5/18/22, at 29, was "undocumented, hearsay testimony of the caseworker[.]" Father's Brief, at 14. In particular, Father argues that the person who testified "had been assigned to the case … [for] only two months" and "had no personal knowledge of [F]ather's involvement in visiting the children, or lack of involvement." *Id.* However, a review of the record establishes that Father raised *no objection* to the CUA case manager's testimony in this regard.[6]

> In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. ... [O]ne must object to errors, improprieties[,] or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

*In re S.C.B.*, 990 A.2d 762, 767 (Pa. Super. 2010) (quoting *Thompson v. Thompson*, 963 A.2d 474, 475-76 (Pa. Super. 2008) (citation omitted)). As such, Father's claim of hearsay, as a basis to contradict his abdication of

---

[6] Father did object to other portions of the CUA case manager's testimony on hearsay grounds, but not her testimony regarding Father's last visitation with Children in March 2019. *See* N.T., 5/18/22, at 11-13, 17-23, 31.

parenting duties, is waived. Even if it were not, the trial court permitted the CUA case manager to testify as to other information she had gleaned from her review of the agency file under the business records exception to the rule against hearsay, *see* Pa.R.E. 803(6); N.T., 5/18/22, at 18-21, and Father has offered no explanation as to why her testimony concerning his lack of visitation derived from the same source would not also be permitted. We further note that there is nothing in the record that contradicts the case manager's clear testimony that Father had not seen Children for more than a year prior to the filing of the termination petition and for more than three years as of the date of the hearing. N.T., 5/18/22, at 29. Accordingly, there was clear and convincing evidence that Father failed to perform his parental duties for a period of well over six months, and the lower court did not abuse its discretion or commit an error of law in concluding the same.

Once a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), the court turns to Section 2511(b), which requires it to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." **T.S.M.**, 71 A.3d at 267 (citation and quotation marks omitted); **see also In the Interest of K.T.**, 296 A.3d 1085, 1106 (Pa. 2023). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical,

- 14 -

and emotional needs and welfare above concerns for the parent." *K.T.*, 296 A.3d at 1105.

Beginning with *In re E.M.*, 620 A.2d 481 (Pa. 1993), our Supreme Court has consistently mandated that any Section 2511(b) analysis "requires consideration of the emotional bonds between the parent and child." *T.S.M.*, 71 A.3d at 267. Specifically, "[c]ourts must determine whether the trauma caused by breaking [the parent-child] bond is outweighed by the benefit of moving the child toward a permanent home." *Id.* at 253 (cleaned up). The recognized threshold for this required bond inquiry is whether termination will sever a "necessary and beneficial relationship," causing the child to suffer "'extreme emotional consequences' or significant, irreparable harm." *K.T.*, 296 A.3d at 1109-10 (quoting *E.M.*, 620 A.2d at 484). "However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." *In re Adoption of A.H.*, 247 A.3d 439, 445 (Pa. Super. 2021) (citation omitted). "Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *Id.* (citation omitted).

"[A] court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *K.T.*, 296 A.3d at 1113. Our Supreme Court has explained that the court should consider, as appropriate, the child's need for permanency and length of time in foster care, the child's placement in a

pre-adoptive home and whether there is a bond with the foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs. *See id.* Nonetheless, there is no "exhaustive list" of factors that must be considered by a trial court in this context. *Id.*, at 1113 n.28.

At this issue, the court explained as follows:

[The DHS representative] testified that she conducted two interviews of the [C]hildren[.] Both [C]hildren have been in the foster home for more than four years and refer to their caregiver as "mom." Both [C]hildren move about the foster home freely and want to remain with their caregiver. They are bonded to each other and to their caregiver. [There was no testimony establishing] that there would be irreparable harm to the Children if they were permanently separated from Mother and Father. The testimony demonstrated that it was in the best interest of the Children to remain with their respective caregivers.

Trial Court Opinion, 7/11/23, at 8 (record citations omitted).

Father's brief contains no record citations supporting his proposition that he and his children "have a strong emotional bond." Father's Brief, at 18. However, there is ample evidence demonstrating the converse: a lack of emotional bond. Father's contact with the Children went from sparing to nonexistent, and the Children do not ask for Father. *See* N.T., 5/18/22, at 51. Moreover, testimony reflected that the Children would not be irreparably harmed if Father's parental rights were terminated. *See id*. Instead, the Children "affectionately call [their foster mother, with whom they have been placed since 2017,] mom mom." *Id*., at 32, 51 (stating, further, that the Children had a parent/child bond with their foster mother).

There has been no error in the court's determination that termination of

Father's parental rights best met the Children's developmental, physical, and emotional needs and welfare. The Children, at the time of the termination hearing, had been with their foster mother for over four years, "their most formative years." *Id*., at 32. Both Children indicated that "they wanted to remain with their mom-mom." *Id*., at 31. In the absence of any indicia of a parental bond between Father and the Children, the record demonstrates, instead, a strong parent-child bond existing between the Children and their foster mother. At the time of the termination of parental rights hearing, the Children had been with their foster mother for more than half of their lives. The testimony also reflected that the Children were happy living with the foster mother, receiving love, comfort, and stability in this environment. As a result of Father's years-long, complete absence in the Children's lives, it was not an abuse of discretion for the court to conclude that no bond existed between him and the Children and therefore that the Children's best interests were served by terminating Father's parental rights. We therefore discern no abuse of discretion or error of law in the trial court's involuntary termination of Father's parental rights to Children, and we affirm the lower court's March 22, 2023 decrees.

In Father's fifth, sixth, and seventh issues in this appeal, he challenges the change of Children's permanent placement goal from reunification to adoption. Given our decision to affirm the trial court's termination decrees, any challenge to the goal change orders is moot. *See A.H.*, 247 A.3d at 446

("[T]he effect of our decision to affirm the [trial] court's termination decree necessarily renders moot the dependency court's decision to change [a] [c]hild's goal to adoption."); *see also In the Interest of A.R.*, ___ A.3d ___, ___, 2023 PA Super 243, slip op. at 17 (Pa. Super. Nov. 28, 2023); *In the Interest of A.M.*, 256 A.3d 1263, 1272 (Pa. Super. 2021). We accordingly also affirm the trial court's goal change orders. *A.R.*, ___ A.3d at ___, 2023 PA Super 243, slip op. at 17; *A.M.*, 256 A.3d at 1272-73.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/3/2024