J-S01032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN RE: ADOPTION OF: J.P., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1333 MDA 2023 |

Appeal from the Decree Entered August 30, 2023
In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s): 020-ADOPT-2023

BEFORE:   PANELLA, P.J.E., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.E.:                    **FILED: MAY 28, 2024**

J.P. ("Mother") appeals from the decree involuntarily terminating her parental rights to her son, J.P. ("Child"), who was born in December 2020. In this appeal, Mother's counsel filed an application to withdraw and an ***Anders***[1] brief, stating that the appeal is wholly frivolous. After careful review, we affirm the Orphans' Court, and grant counsel's request to withdraw.

In December 2020, Cumberland County Children and Youth Services ("Agency") first became involved with Mother when it received a general protective services ("GPS") report that Child tested positive for marijuana at the time of his birth. ***See*** N.T., 8/29/23, at 55, 63-64. This case was closed on January 7, 2021. ***See id.*** Mother had previously come to the attention of

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] ***Anders v. California***, 386 U.S. 738 (1967).

Dauphin County Social Services for Children and Youth on April 10, 2020, when the Dauphin County agency received a GPS report that Mother could not provide adequate care to Child's older brother, G.P. *See id.* at 54. Mother voluntarily placed G.P., who was approximately one year old at that time, with maternal grandmother for several days; because Mother was not cooperative with the Dauphin County agency, the case was closed on June 9, 2020. *See id.* at 54-55.

The Agency received a second GPS report on July 10, 2021, regarding Mother yelling at Child in a doctor's office. *See id.* at 55-56. Mother was offered counseling at that time, which she refused. *See id.* at 56. On January 18, 2022, the Agency received a third GPS report directly from Mother, who reported that she was depressed and needed assistance caring for her children. *See id.* at 56, 70. The Agency caseworker who visited the home reported that:

> There were multiple broken things in the home. The TV was shattered and on the floor. Mother reported throwing a frying pan at a mirror in a bedroom and there was broken glass on the floor. The boys were on the floor eating . . . cereal [that had been] tossed on the floor.
>
> Mother reported that she was sleeping until noon. No one was watching the boys. She was not bathing the boys. She had not been eating for days. [Child] needed three stitches on his face from the broken glass that was in the home.

*Id.* at 56.

Child and G.P. were removed from Mother's care on January 18, 2022, and were placed in the foster care home in which Child continues to reside.

*See id.* at 57; CYS Exhibit 1 (January 19, 2022 order in dependency docket confirming Child's emergency removal the prior day and February 1, 2022 order granting shelter care application). G.P. also remained in this foster home until he was reunited with his father, T.W., in March 2023. *See* N.T., 8/29/23, at 57. The foster parents are a pre-adoptive resource for Child. *See id.* at 47; Report of Intent to Adopt, 7/26/23.

On March 4, 2022, Child was adjudicated dependent and committed to the Agency's custody. *See* CYS Exhibit 1 (March 4, 2022 order of adjudication). The Agency developed a permanency plan for Mother, which required her to obtain appropriate housing for herself and Child; demonstrate financial stability; obtain a mental health evaluation and follow through on all recommendations; seek counseling for domestic violence issues; complete a parenting assessment and following the recommendations from the service provider; maintain frequent communication with the Agency; attend Child's medical appointments; and refrain from use of alcohol and illegal drugs, complete a drug and alcohol evaluation, follow the recommendations from the evaluation, and submit to drug screens. *See* CYS Exhibit 3 (Permanency Plans dated February 14, 2022, June 22, 2022, November 17, 2022, April 24, 2023, and July 27, 2023).

Permanency review hearings were held on July 18, 2022, December 15, 2022, and May 17, 2023, and judicial conferences were held before a hearing officer on May 9, 2022, October 3, 2022, and March 2, 2023. In the permanency review orders, Mother was determined to be in minimal or

moderate compliance with the permanency plan and to have made minimal or moderate progress towards alleviating the circumstances that necessitated the original placement. **See** CYS Exhibit 1 (August 1, 2022, December 27, 2022, and May 30, 2023 permanency review orders).

During the course of the case, Mother identified D.C. as Child's father but indicated that she did not have his contact information. **See** N.T., 8/29/23, at 57. The Agency attempted an exhaustive search for D.C. and was unable to locate him or establish his identity. **See id.** at 6-7, 58-59.

On June 9, 2023, the Agency filed a petition for termination of Mother's parental rights to Child. The Agency also filed a petition to terminate the parental rights of Child's unknown father. Furthermore, although not believed to be Child's biological father, T.W., the father of Child's older brother, G.P., executed a consent to adoption of Child, and the Agency filed a petition to confirm T.W.'s consent to Child's adoption. Hearings were held on the petitions on August 22 and 29, 2023, at which Mother, the Agency caseworker, Child's foster mother, and three employees of Alternative Behavior Consultants ("ABC"), the service provider responsible for visitation and parental training, testified.[2]

Following the hearings, on August 30, 2023, the Orphans' Court entered a decree terminating Mother's parental rights to Child. The court entered

---

[2] Child was represented in these proceedings by a guardian *ad litem* and separate legal interests counsel.

decrees on that same date terminating T.W. and the unknown father's parental rights to Child. Mother filed a timely notice of appeal and concurrently filed a concise statement of errors complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i).

Before this Court, Mother's counsel has filed an *Anders* brief and application to withdraw as counsel. In his *Anders* brief, counsel presents the following issues:

> 1. Whether the [orphans' c]ourt abused its discretion and committed an error of law when it found that sufficient grounds existed for a termination of [Mother's] parental rights to her child, despite a lack of clear and convincing evidence, thus contravening section 2511(a) of the Adoption Act, 23 Pa.C.S.A. §2511(a).
>
> 2 Whether the [orphans' c]ourt abused its discretion and committed an error of law in terminating [Mother's] parental rights when the conditions which led to the removal or placement of the child no longer existed or were substantially eliminated, thus contravening sections 2511(a) and (b) of the Adoption Act, 23 Pa.C.S.A. §2511(a), (b).
>
> 3 Whether the [orphans' c]ourt abused its discretion and committed an error of law in determining it would be in the child's best interest to have parental rights terminated, when [Mother], if given sufficient time, would be ready, willing, and able to parent the child and provide for his needs, thus contravening Section 2511(b) of the Adoption Act, 23 Pa.C.S.A §2511(b).

*Anders* Brief at 4-5 (suggested answers omitted). Mother has not filed a response to counsel's application to withdraw or *Anders* brief. The Agency did not file a brief in this appeal but advised this Court by letter that it agrees with the Orphans' Court's reasoning as stated in its opinion.

Before this Court can consider the merits of this appeal, we must first determine whether counsel has satisfied all the requirements that court-appointed counsel must meet before leave to withdraw may be granted. *See **In re Adoption of B.G.S.***, 240 A.3d 658, 661 (Pa. Super. 2020).

To withdraw from representing a party that is entitled to counsel on the basis that the appeal is frivolous, counsel must (1) petition the court for leave to withdraw stating that he has made a conscientious examination of the record and has determined that the appeal would be frivolous; (2) file a sufficient ***Anders*** brief; and (3) provide a copy of the ***Anders*** brief to the client and advise the client of her right to retain new counsel or proceed *pro se* and to raise any additional points that she deems worthy of the court's attention. *See id.* The ***Anders*** brief must:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* (quoting ***Commonwealth v. Santiago***, 978 A.2d 349, 361 (Pa. 2009)). If counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the record and render an independent judgment as to whether the appeal is wholly frivolous. *See id.* at 662.

Counsel has filed an application to withdraw in which he states that he has made a conscientious examination of the record and determined that there are no non-frivolous grounds for the appeal. Counsel provided copies of the ***Anders*** brief and application to withdraw to Mother and has sent a letter to Mother advising her of her right to retain new counsel or proceed *pro se* on appeal and to raise any points she deems worthy of the court's attention. Counsel's ***Anders*** brief provides a procedural and factual summary of the case with references to the record and discusses the applicable law on which counsel bases his conclusion that there are no non-frivolous issues that he can raise on Mother's behalf. Counsel has thus filed a sufficient ***Anders*** brief and has adequately complied with the procedural requirements for withdrawal.

We therefore proceed to conduct an independent review to ascertain whether the appeal is indeed wholly frivolous. This Court first considers the issues raised by counsel in the ***Anders*** brief and determines whether they are in fact frivolous. ***See B.G.S.***, 240 A.3d at 662. In addition, if the Court finds those issues frivolous, this Court conducts an examination of the record to discern if there are any other issues of arguable merit overlooked by counsel. ***See id.***

Our standard of review in this appeal is well-settled:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest

unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination[.]" *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the Orphans' Court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare. *See T.S.M.*, 71 A.3d at 267.

Here, the Orphans' Court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S.A. §

- 8 -

2511(a)(2), (5), (8), (b).[3] However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on Section 2511(a)(2), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>             \*       \*       \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

> Under Section 2511(a)(2),
>
> the moving party must prove by clear and convincing evidence that there is (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

---

[3] The petition for termination of Mother's parental rights also asserted Section 2511(a)(1) as grounds for termination, and the Orphans' Court indicated at the hearing that it found that termination was appropriate under subsection (a)(1) in addition to the other subsections. **See** Termination Petition, 6/9/23, ¶ 4; N.T., 8/29/23, at 105. However, in its opinion, the Orphans' Court only found that termination was appropriate under subsections (a)(2), (5), and (8). **See** Orphans' Court Opinion, 10/27/23, at 8-10 (unnumbered).

*In re Adoption of L.A.K.*, 265 A.3d 580, 600 (Pa. 2021) (citation omitted).

> [S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and emphasis omitted).

"The grounds for termination [under Section 2511(a)(2)] are not limited to affirmative misconduct," but also include refusal and "parental incapacity that cannot be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id.* at 443; *see also In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*), *affirmed*, 240 A.3d 1218 (Pa. 2020) (noting that a parent has "an 'affirmative duty' to work towards the return of [her] children[," which requires, at a minimum, that she "cooperate with the Child and Youth Agencies and complete the rehabilitative services necessary so that the parent can perform [her] parental duties and responsibilities") (citation omitted). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Z.P.*, 994 A.2d at 1118 (citation omitted). "[W]hen a parent

- 10 -

has demonstrated a continued inability to conduct [her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." ***Id.*** (citation omitted).

The record here supports the Orphans' Court's determination that Mother's incapacity caused Child to be without essential parental care and that she could not or would not remedy the causes of that incapacity. Testimony at the hearings established that Mother had not met any of the goals established in the Agency permanency plan during the twenty months since Child's removal and Mother had only begun to show "slight progress" in the five months preceding the hearing. N.T., 8/29/23, at 73-74. The Agency caseworker stated that the primary reason for Child's removal was Mother's mental health issues, which led to concerns regarding domestic violence, drug and alcohol abuse, and unstable housing. ***See id.*** at 73. Mother had an uneven history in compliance with her mental health plan objectives. She initially began seeing one service provider in February 2022, but that ended in May 2022, when she was incarcerated. ***See id.*** at 66. Mother then was scheduled to attend two intake appointments for mental health services later in 2022, but she failed to appear for both. ***See id.*** In February 2023, Mother began to see a therapist through a new service provider, and she had been "fairly" consistent in attending appointments since then. ***See id.*** at 66-67, 71.

The Agency was aware of numerous incidents of domestic violence involving Mother and her paramour, S.A., with whom she has been in a relationship since April 2021. ***See id.*** at 59. Although Mother reported on multiple occasions that she is no longer in a relationship with S.A., those representations were called into question by later incidents where S.A. was known to be in Mother's company, including S.A.'s presence at the first termination hearing. ***See id.*** at 59-60, 76. The Agency caseworker observed Mother with bruising, a black eye, and a busted lip on different occasions, and Mother reported to the foster parents in November 2022 that she was in the hospital because S.A. had tried to kill her. ***See id.*** at 60. Mother briefly resided in a domestic violence shelter but reportedly left to resume living with S.A. ***See id.*** at 61, 71. Mother was also charged with simple assault in March 2023, and defiant trespass and disorderly conduct in June 2023, related to incidents involving S.A., although those charges had been either dismissed or withdrawn. ***See id.*** at 60. Despite having been ordered to engage in domestic violence services, Mother had not provided any evidence to the Agency that she had sought such services. ***See id.*** at 60-61.

Mother had also failed to demonstrate to the Agency that she was not using alcohol and illegal drugs. ***See id.*** at 64. While Mother did complete drug tests while on probation and she completed an inpatient hospitalization program in September 2022, Mother had not submitted to any drug screens ordered by the Orphans' Court in the dependency proceeding and did not follow through on recommendations that she begin intensive outpatient

therapy, which was recommended during a drug and alcohol evaluation completed during her incarceration. *See id.* at 64-66.

The Agency caseworker testified that Mother had a very unstable housing history. *See id.* at 61, 63, 69. Beginning in January 2022, the date Child was removed, Mother was reported to be living in an apartment from which she was evicted; in an efficiency apartment; at a domestic violence shelter; in Cumberland County Prison for twenty-two days; with an unknown relative; in jail again for twenty days; with S.A.; with her grandmother; and with her mother, Child's maternal grandmother. *See id.* at 61-62. Maternal grandmother asked Mother to leave her home in December 2022, Mother returned to live with maternal grandmother in March 2023, but Mother was again evicted from that home in June 2023. *See id.* at 62. Mother then lived with her father for some time until she was asked to leave based upon a Protection From Abuse ("PFA") order that her father had obtained against Mother two years' prior. *See id.* Mother did provide the Agency with a lease for a small apartment that she had begun renting shortly before the termination hearings, but the lease was week-to-week and indicated that the leased property was not for residential use; both factors led the caseworker to conclude that the apartment would not be suitable for reunification with Child. *See id.* at 62-63, 72.

Regarding the permanency goals of maintaining communication with the Agency, demonstrating financial stability, and attending Child's medical appointments, the Agency caseworker stated that Mother has been difficult to

- 13 -

maintain contact with at times—Mother has had twenty-four different phone numbers and six different email addresses during the course of the case, for example—and Mother directed "a lot of negativity and hostility" towards the caseworker throughout the case. *Id.* at 75; *see id.* at 63, 74, 76. Mother has also never explained to the Agency how she supports herself, having stated that she has had many job interviews but never having indicated that she obtained employment, besides claiming that she does "nails and hair [] on the side." *Id.* at 67; *see id.* at 68. Mother is also on a payment plan with the courts for her outstanding fines and she has been ordered to pay child support to T.W. for G.P., further calling into question how she could support Child. *See id.* at 68-69. Concerning Mother's goal to attend Child's medical appointments, the foster mother testified that she kept Mother informed of Child's appointments, but Mother only chose to attend the first early intervention appointment, which was held virtually. *See id.* at 44-45.[4]

The representatives from service provider ABC provided testimony regarding Mother's participation in parental training, reunification services, and supervised visitation. Mother completed a parenting assessment in January 2022, and then began parenting education sessions, but her case was closed on April 1, 2022, due to her lack of housing, mental health instability,

_____

[4] Upon the recommendation of the Agency, the foster mother cut off communication with Mother in December 2022, or January 2023, after Mother began to send "hostile" and "borderline harassing" messages. N.T., 8/29/23, at 45, 48.

and involvement with adult probation. *See id.* at 8-9, 23-24. Mother was enrolled again in March 2023, and successfully completed the parenting program, thus allowing her to transition to an in-home reunification program. *See id.* at 8-9, 17. However, in early June 2023, just as the reunification sessions were about to begin, Mother was evicted from maternal grandmother's home, after maternal grandmother returned from vacation to discover that Mother had been having parties at the house involving drinking, drug use, and destruction of property. *See id.* at 18-19. Mother moved in with her father and attempted to begin reunification services again, but the Agency determined that reunification was not possible there due to the fact that her father had an active PFA order against Mother. *See id.* at 19-20, 23. Mother also participated in "guided" visitation with Child and G.P. at ABC's offices throughout the case, but she attended only thirty-three of fifty-four sessions, was generally not receptive to prompts from the supervisor, and was not able to progress to less-supervised visitation. *See id.* at 28-34, 41.

In sum, the evidence established that Mother had demonstrated little evidence that she could remedy the parental incapacity that had caused Child to be without essential care. As the Orphans' Court explained, in the twenty months since Child had been removed "not much has changed with regard to Mother's ability to provide a consistent and stable home environment for" Child, as she had not obtained suitable housing, she had not addressed her mental health, drug and alcohol, and domestic violence concerns, nor had she

completed any of her permanency goals. *Id.* at 105; *see also* Orphans' Court Opinion, 10/27/23, at 9-10 (unnumbered).

While counsel's *Anders* brief cites Mother's claims that she made progress in addressing her mental health concerns and otherwise satisfying her permanency goals, *see Anders* Brief at 13-14, we find no abuse of discretion in the Orphans' Court's determination that Child's "need for permanence and stability" should not be "subordinate[d] indefinitely" to Mother's "claims of progress and hopes for the future." *In the Matter of M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019) (citation omitted); *see* Orphans' Court Opinion, 10/27/23, at 10 (unnumbered) ("[I]t is evident that additional time will not result in [Child] receiving permanency in an acceptable timeframe[,] if at all."); N.T., 8/29/23, at 105-06 ("And none of these areas of concern can be remedied in a brief or short amount of time. [Child] deserves permanency and he deserves permanency now."). Counsel further states that Mother's incarceration alone is insufficient to support termination. *See Anders* Brief at 14; *In the Interest of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*). However, incarceration can hardly be blamed for limiting Mother's ability to work towards her permanency goals where she was incarcerated for only forty-two days of the twenty months between Child's removal and the termination hearings. *See* N.T., 8/29/23, at 61.

As we have concluded that the Agency put forth clear and convincing evidence showing that termination was warranted under Section 2511(a)(2), we turn to Section 2511(b), which provides that:

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S.A. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." ***T.S.M.***, 71 A.3d at 267 (citation and internal quotation marks omitted); ***see also Interest of K.T.***, 296 A.3d 1085, 1106 (Pa. 2023). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." ***K.T.***, 296 A.3d at 1105 (citation omitted).

Our Supreme Court has consistently mandated that any Section 2511(b) analysis "requires consideration of the emotional bonds between the parent and child." ***T.S.M.***, 71 A.3d at 267. Specifically, "[c]ourts must determine whether the trauma caused by breaking [the parent-child] bond is outweighed by the benefit of moving the child toward a permanent home." ***Id***. at 253. The recognized threshold for this required bond inquiry is whether termination will sever a "necessary and beneficial relationship," causing the child to suffer "'extreme emotional consequences' or significant, irreparable harm." ***K.T.***, 296 A.3d at 1109-10 (citations omitted). "However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." ***A.H.***, 247 A.3d at 445 (citation omitted). "Accordingly,

the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *Id.* (citation omitted).

Additionally, "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *K.T.*, 296 A.3d at 1113. Our Supreme Court has explained that the court should consider, as appropriate, the child's need for permanency and length of time in foster care, the child's placement in a pre-adoptive home and whether there is a bond with the foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs. *See id.* The Court in *K.T.* emphasized that "the parental bond **is but one part** of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* (emphasis added). Therefore, there is no "exhaustive list" of factors that must be considered by an Orphans' Court in this context. *Id.* at 1113 n.28.

In his *Anders* brief, counsel notes Mother's arguments that termination of her parental rights would not be in "[C]hild's best interests as, despite her struggles and periods [of] incarceration and time away from him, she loves her son, and wants to prove to everyone that she can provide the care he needs." *Anders* Brief at 16. Counsel further states that "Mother believes her son needs her in his life" and that termination will result in Child "not knowing his mother." *Id.*

The Supreme Court of Pennsylvania has provided guidance to us when reviewing whether termination is appropriate when considering the emotional bonds between the parent and child. As with other matters dealing with critical decisions effecting children's lives, we must approach this review with the purpose of securing the best interests and needs and welfare of the children subject to the review:

> As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

*T.S.M.*, 71 A.3d at 268-69 (citation omitted). Significantly, our Supreme Court has made the insightful observation that "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269.

> Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail ... the result, all too often, is catastrophically maladjusted children.

*Id*.

Based on our review of the record, we discern no abuse of discretion by the trial court in concluding that termination of Mother's parental rights would best serve the Children's developmental, physical, and emotional needs and

welfare. **See T.S.M.**, 71 A.3d at 267. Although Mother stated that she loves her son, and that her son needs her in his life, the trial court credited the testimony at trial that despite the provision of numerous services and referrals to service provides, Mother has failed to avail herself of most programs and has failed to complete those which she started. At the time of the trial, the Orphans' Court concluded that Mother did not demonstrate that she presented herself as a safe and appropriate parent. Because of this, her visitation with Child has never progressed beyond guided visitation. Leading up to the trial herein, Mother missed 21 visitation sessions with Child out of a total of 54 scheduled visits.

Further, as our Supreme Court explained in **K.T.**, an analysis under Section 2511(b) is not limited to whether severing the parent-child bond will have a detrimental effect on the child. **See K.T.**, 296 A.3d at 1113. The trial court must also consider other factors such as the child's need for permanency, the length of time the child has been in foster care, whether the child is in a preadoptive home, the child's bond with foster parent[s], and "whether the foster home meets the child's developmental, physical and emotional needs, including intangible needs of love, comfort, security, safety, and stability." **Id.** (footnote omitted).

Here, the Orphans' Court found that Child remains in a safe, stable environment, which has now been Child's home for over 2 years. The foster parents are dependable and dedicated to Child's development and intend to

adopt Child if possible. **See** Orphans' Court Opinion, 10/27/23, at 10 (unnumbered); **see also** N.T., 8/29/23, at 105 (court stating that Child "has been loved and cared for consistently" in the "stable home" provided by the foster parents). These findings are supported by the record.[5] The Orphans' Court further noted that Child's guardian *ad litem* and legal interests counsel each concurred with the Agency that termination of Mother's parental rights was in Child's best interests. **See** Orphans' Court Opinion, 10/27/23, at 10 (unnumbered).[6]

In light of the above, we find no error in the Orphans' Court decision to grant termination under the Section 2511(b) factors. In this case, the record

_____

[5] The Agency caseworker testified that foster parents meet all of Child's emotional and physical needs, have a healthy attachment with Child, and are affectionate towards Child, which Child reciprocates. **See** N.T., 8/29/23, at 78. The foster mother testified that she and her husband love Child and view him as part of the family and that they share a bond with Child. **See id.** at 46-47. The foster mother further stated that Child calls her and her husband "mom" and "dad," that they wish to adopt Child, and that they would facilitate post-adoption contact with G.P. and Mother, if feasible. **See id.** at 45-47, 48-49, 51. The foster mother reported that Child is up to date on his medical and dental visits, and he was meeting all of his developmental milestones. **See id.** at 43-44, 50.

[6] **See also** N.T., 8/29/23, at 103-04 (guardian *ad litem* stating that foster parents are "superb foster parents" who have "work[ed] very hard to be communicative and supportive of Mother" and also maintain a relationship with T.W., G.P.'s father, and stating that in light of Mother's failings to meet any of the goals set by the Agency, Child's "best interests are absolutely served by remaining in the home of the" foster parents; **id.** at 104 (legal interests counsel agreeing that termination was in Child's best interests and stating that she was unable to ascertain Child's preference due to his age but that foster parents appropriately cared for Child and there was a bond between them).

does not show that there is any potential for emotional consequences or an adverse impact to Child by severing the parental bond with Mother. Furthermore, the record strongly supports the Orphans' Court's conclusion that termination is necessary to assure Child's developmental, physical, and emotional needs.

Accordingly, we affirm the order pursuant to Section 2511(a)(2) and (b) of the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (b). Counsel's request to withdraw is granted.

Order affirmed.

Judge Kunselman joins the memorandum.

Judge Colins files a dissenting statement.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/28/2024